[Sac. No. 4068. In Bank.—March 27, 1928.]

NELITA FRANKLIN, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

Levinsky & Jones and Henley C. Booth, for Appellant.

Nutter, Hancock & Rutherford and A. P. Hayne for Respondent.

PRESTON, J.—This record presents certain complex questions of law controlled by federal decisions. The facts, however, are not in dispute and appear from the judgment-roll to be substantially as follows:

On June 26, 1925, plaintiff below was the holder of a passenger ticket entitling her to transportation in interstate commerce over defendant's railway system from the city of Lodi, state of California, to the city of Fairhope, state of Alabama, which journey required a change of cars at San Fran-

cisco. On said day she embarked on her trip and duly arrived at San Francisco with two pieces of hand-baggage, with contents of the value, as found by the court, of eight hundred dollars. This baggage was of the type customarily taken by passengers on board trains for personal use. After plaintiff's arrival at San Francisco, and later on the same day when she was about to re-embark upon her journey toward Alabama, she handed her baggage to a porter of defendant, known familiarly as a "red cap," with instructions to redeliver same to her on board the train. The baggage was never redelivered to her, but was lost through the negligence of this servant of defendant. Plaintiff below had judgment for the full amount and defendant appealed.

Appellant urges that any judgment in excess of twenty-five dollars was erroneous. Respondent, however, insists that no error is shown by the record and that full liability existed. The case is important both to the railway company and to the traveling public. The principal finding upon which respondent relies for relief is as follows:

"That when plaintiff was about to embark in the train of defendant in the City and County of San Francisco in the course of her said journey toward Alabama, one of said red cap porters of defendant acting in the course of his duty as aforesaid, took from plaintiff the said suitcase and said hand bag with their contents, to return the same to plaintiff on said train after plaintiff had embarked therein as such passenger. That while said employee of defendant had said suit case and said hand bag in his custody, he so negligently and carelessly kept, cared for and carried said property of plaintiff that the same was lost and neither the defendant nor any employee of defendant nor anyone at all have ever returned said property to plaintiff, either on the train of defendant after plaintiff had entered same or at any other time or place and plaintiff has never recovered possession of said property or any part thereof."

Appellant, however, chiefly relies upon finding V, which is as follows: "That on the 26th day of January, 1925, there was on file, and had been on file ever since the first day of September, 1922, with the Interstate Commerce Commission of the United States, and the Railroad Commission of the State of California, that certain Tariff known and described as Western Baggage Tariff No. 8, I. C. C. No. 12, which said

Tariff was filed, issued and became effective, and was in due and legal force and effect ever since said first day of September, 1922, in accordance with the laws of the United States, and with the rules and regulations of the Interstate Commerce Commission of the United States, in such case made and provided. That said tariff, among other things, therein provided in Rule 10 thereof, the following provision and limitation: 'Rule 10. Where red cap porter service is provided, hand baggage will be handled without charge by red cap porters to and from trains of Southern Pacific Company. Liability upon hand baggage handled by red cap porters will be limited to $25.00.' ''

The contract to transport respondent admittedly imposed upon appellant the duty of transporting the hand baggage or luggage in question. In considering federal decisions care must be used lest confusion result. The first important consideration at the outset is: Were the services of the porter tendered to and accepted by respondent gratuitous? We think that clearly they were not.

Plaintiff paid the full price for her transportation with the knowledge, presumptive or actual, that this service was part of the consideration entering into the purchase. The fact that it might or could be dispensed with did not make it gratuitous. Porter service of all kinds might be withheld, but the answer to this proposition is that good business principles doubtless require it in order to get and retain patronage. This service must be held to have been covered by the fare paid for the transportation. (*Herbert* v. *Shanley Co.*, 242 U. S. 591 [61 L. Ed. 511, 37 Sup. Ct. Rep. 232]; *Cannon* v. *Fargo,* 222 N. Y. 321 [118 N. E. 796]; *Great Western Ry. Co.* v. *Bunch,* 13 App. Cas. 31; 5 Eng. Ruling Cas. 471.)

This holding makes inapplicable such cases as *Boering* v. *Chesapeake Beach Ry. Co.,* 193 U. S. 442 [48 L. Ed. 742, 24 Sup. Ct. Rep. 515, see, also, Rose's U. S. Notes]. In said case plaintiff, while riding upon a pass, was held chargeable upon the terms upon which his free transportation was based. The rule of slight care and liability only for gross negligence likewise is not in this case. This makes inapplicable also such California cases as *Davis* v. *National Lbr. Co.,* 22 Cal. App. 111 [133 Pac. 509], and *Northwestern etc. Assn.* v. *Pacific Co.,* 187 Cal. 38 [200 Pac. 934].

The next question which arises is: When did the liability, if any, of the appellant attach and was it that of a common carrier or that of a warehouseman? We think clearly its liability was that of a common carrier. The train upon which respondent was to be transported, along with her baggage, was about to depart and the purpose of the presence of the porter was to facilitate her entry thereon for the mutual advantage of both the railway company and herself. It cannot be seriously disputed that these facts put the baggage of respondent in interstate commerce and the liability of the carrier began then, it being admitted that respondent was at the time of such delivery to the porter in possession of a railway ticket and then and there about to go aboard the train. The authorities throwing light upon this point are as follows:

Michie on Carriers, volume 4, sections 3448 and 3450, where it is said: "The liability of a railroad company as insurer's of luggage commences from the moment when it is placed under the control of one of their authorized employees for the purpose of putting it in transit. The acceptance of baggage for transportation by the employee of the carrier at the station of another company where the carrier receives passengers for carriage, imposes upon the carrier the obligation of a common carrier. And a steamship engaged in carrying passengers and their baggage from one port to another is responsible to a passenger for the injury to the contents of a trunk by its falling into the water while being carried from a wharf on board the vessel by persons in the employment of the managers of the vessel, . . . To make a carrier liable for baggage delivered to it, it must be delivered and accepted for transportation within a reasonable time before departure of the train. The passenger has a right to deliver his baggage to the carrier such time before the starting of the train upon which he intends to take passage as may be reasonably necessary for obtaining a ticket and checking the baggage. From the time delivery is thus made, the carrier will be responsible for its safety, as a common carrier."

*Lovell* v. *London, Chatham etc. Ry. Co.*, 45 L. J. Q. B. 476, 34 L. T. 127, 24 W. R. 394, 6 R. & C. T. Cas. lxix, 3 R. & C. T. Cas. xx, is a case very similar to the one before us except for the fact that the passenger there was about to

purchase a ticket but had not actually done so. It is there said by Blackburn, J.: "The plaintiff, intending to be a passenger, makes a mistake as to the time of her train, thinking that it started at 2:50, while as a fact, it started twenty minutes later. On arriving at the station, the porter said to her that there was no train to Broadstairs at 2:50. She asked him when the next train was, and he replied at 3:13. The luggage was then taken down from the cab, and the porter said he would label the luggage if she would get her ticket. She asked when the booking office would be open, and was told in a few minutes. She therefore went to it and found it was not then open, but it was opened two minutes afterwards, she then got her ticket, went to the porter who had taken her luggage to label it, and discovered that the dispatch box was missing. The question is, had the porter received the luggage as the servant of the company and at the commencement of the journey. I think that he had. I do not see how any railway company could carry on its business as a carrier of passengers if this is not to be considered as the beginning of the journey." And it was there said by Lush, J.: "I own that I think this is a very plain case. A passenger arrives at the station just before the time when she expects her train to start for Broadstairs. She was, however, mistaken in the hour of the departure of the train. A porter comes up to the cab. 'Am I in time for the 2:50 train?' she asks. 'There is no such train,' he replies, 'but there is one at 3:13.' 'Can I get my ticket?' she inquires. 'Yes, in a few minutes,' is the answer and then while she goes to take her ticket, the porter takes the luggage away to label it. She therefore did not go for the purpose of leaving her luggage at the station, but intending to go by the train, and the luggage was delivered in the ordinary way to the servants of the company not to be kept, but for the very purpose for which people go with luggage to railway stations, that is to say, to have it labelled and put in the train. Under these circumstances, I have no doubt that the company are liable for its loss."

Hutchinson on Carriers, volume 3, third edition, page 1524, section 1281, states: "The passenger has the right to deliver his baggage to the carrier such time before the starting of the train upon which he intends to take passage as may be reasonably necessary for obtaining a ticket

and checking the baggage. From the time delivery is thus made, the carrier will be responsible for its safety as a common carrier."

We therefore can accord no weight or strength to the position of appellant denying liability for full value, because, as expressed by it, "the hand baggage was not received for transportation and was not being handled by defendant as a common carrier," and the act of the porter was "the tender of a noncommon carrier service which was furnished without charge."

We next approach the rules of law which govern the liability of carriers of baggage and freight. The common-law liability of such carriers has a dual aspect—the liability practically as insurer and its liability for negligence on the part of itself or its servants. This principle is expressed in 5 R. C. L., page 187, section 803, as follows: "A common carrier has in truth two distinct liabilities; the one for losses by accident or mistake, where he is liable by the custom of the realm or the common law as an insurer; the other for losses by default or negligence, where he is answerable as an ordinary bailee."

Appellant's liability, if any, as an insurer is not before us, as the finding of negligence is specific. In so far as the negligence of the carrier or its servants is concerned, it seems to be everywhere conceded that, generally speaking, under the common law, a tariff having for its object the curtailment of this liability is absolutely void. As early as the case of *New York Cent. R. R. Co.* v. *Lockwood,* 17 Wall. (84 U. S.) 357, 381 [21 L. Ed. 627, see, also, Rose's U. S. Notes], it is said: "Conceding, therefore, that special contracts, made by common carriers with their customers, limiting their liability, are good and valid so far as they are just and reasonable; to the extent, for example, of excusing them for all losses happening by accident, without any negligence or fraud on their part; when they ask to go still further, and to be excused for negligence—an excuse so repugnant to the law of their foundation and to the public good—they have no longer any plea of justice or reason to support such a stipulation, but the contrary." The above statement was approved in *Bank of Kentucky* v. *Adams,* 93 U. S. 174, 181 [23 L. Ed. 872, see, also, Rose's U. S. Notes].

In other types of bailment, we find the same rule. In the case of *Patterson* v. *Wenatchee Canning Co.*, 59 Wash. 556 [110 Pac. 379], it is said: "It is well settled that a bailee may by contract exempt himself from liability except for his own fraud or negligence."

In *Pilson* v. *Tiptop Auto Co.*, 67 Or. 528 [136 Pac. 642], it is said: "It is the better rule that a bailee for hire cannot by contract so limit his responsibility to the bailor as not to be liable for his own negligence or the negligence of his agents and servants."

*Northwestern Mutual Fire Assn.* v. *Pacific Co.*, 187 Cal. 38, 41 [200 Pac. 934, 936] : "The general rule that a depositary or bailee for hire in the course of his ordinary business cannot relieve himself by contract or notice from responding in damages for loss arising from his own negligence or that of his agents or servants may be conceded." (Citing *New York Cent. R. R. Co.* v. *Lockwood, supra,* and other cases.)

The same rule also applies to contracts by telegraph companies attempting to exempt themselves from negligence, except on the conditions of reduced rates (*Primrose* v. *Western Union Tel. Co.*, 154 U. S. 1 [38 L. Ed. 883, 14 Sup. Ct. Rep. 1098]). The rule applies to warehousemen (*Cleveland etc.* v. *Dettlebach,* 239 U. S. 588 [60 L. Ed. 453, 36 Sup. Ct. Rep. 177, see, also, Rose's U. S. Notes]).

This doctrine, as regards carriers, has undergone a few changes to modernize it, but only one qualification thereof touches the situation before us and that is that what amounts to a limitation of liability may be made by special contract with the shipper where the charges are graduated according to the value of the property as fixed by the shipper, he having at all times the privilege of securing full coverage by paying the stipulated charge for such protection. This qualification of the rule appears to rest upon the doctrine of estoppel. It is found as early as the case of *Hart* v. *Penn. R. R. Co.*, 112 U. S. 331, 340 [28 L. Ed. 717, 5 Sup. Ct. Rep. 151]. It was followed in *Kansas So. Ry.* v. *Carl*, 227 U. S. 639 [57 L. Ed. 683, 33 Sup. Ct. Rep. 391, see, also, Rose's U. S. Notes], where it is said: "A declared value by the shipper for the purpose of determining the applicable rate, when the rates are based upon valuation, is not an exemption from any part of its statutory or common law liability."

In *Cincinnati etc. Co.* v. *Rankin,* 241 U. S. 319, 327 [60 L. Ed. 1022, 36 Sup. Ct. Rep. 555, 558], it is said: "Under our former opinions the settled doctrine is that where alternate rates fairly based upon valuation are offered a railroad may limit its liability by special contract. (*Pierce Co.* v. *Wells Fargo & Co.,* 236 U. S. 278, 283 [59 L. Ed. 576, 35 Sup. Ct. Rep. 351, see, also, Rose's U. S. Notes].) The essential choice of rates must be made to appear before a carrier can successfully claim the benefit of such a limitation and relief from full liability."

In *Boston & Maine R. R. Co.* v. *Piper,* 246 U. S. 439 [Ann. Cas. 1918E, 469, 62 L. Ed. 820, 38 Sup. Ct. Rep. 354, see, also, Rose's U. S. Notes Supp.], we find the following language: "In the cases in which the recovery for the lesser valuation has been affirmed, the shipper was offered an opportunity to recover a greater sum than the declared value upon paying a higher rate to the carrier."

In the case of *Union Pac. R. R. Co.* v. *Burke,* 255 U. S. 317, 321 [65 L. Ed. 656, 41 Sup. Ct. Rep. 283, 284, see, also, Rose's U. S. Notes Supp.], we find the following: "This court has consistently held the law to be that it is against public policy to permit a common carrier to limit its common-law liability by contracting for exemption from the consequences of its own negligence or that of its servants (112 U. S. 331, 338 [28 L. Ed. 717, 5 Sup. Ct. Rep. 151], and 246 U. S. 439, 444 [62 L. Ed. 820, 38 Sup. Ct. Rep. 354], *supra*), and valuation agreements have been sustained only on principles of estoppel and in carefully restricted cases where choice of rates, was given, where 'the rate was tied to the release.'"

The cases of *Boston & Maine R. R. Co.* v. *Hooker,* 233 U. S. 97 [Ann. Cas. 1915D, 593, L. R. A. 1915B, 450, 58 L. Ed. 868, 34 Sup. Ct. Rep. 526], and *Galveston etc. Ry. Co.* v. *Woodbury,* 254 U. S. 357 [65 L. Ed. 301, 41 Sup. Ct. Rep. 114, see, also, Rose's U. S. Notes Supp.], are not at variance with these last two mentioned cases as the shipper there was given a choice of rates. These cases harmonize because the Interstate Commerce Act (49 U. S. C. A., sec. 1 et seq.) adopts the common-law rule as modified by a tariff allowing a choice of rates.

Appellant relieves the court of much labor in making the following frank statement: "We freely admit, and have

never denied, that if this were a case of the loss of baggage checked from one state to another and we were defending on the basis of a clause in a tariff which provided that 150 lbs. of baggage might be checked free on each full fare ticket and that the liability of the carrier in the event of loss or damage to such baggage should in no case exceed the sum of $100 and if it were further shown that the tariff gave the passenger no option or privilege of declaring a higher value and paying an additional amount in consideration of the railroad company assuming the obligation of paying loss at such declared value, we would have no defense at all.''

We are also indebted to appellant for the further concession as follows: ''It also was undoubtedly the common law, as re-stated by Section 20 of the Interstate Commerce Act (49 U. S. C. A., sec. 20), that a common carrier could not contract against the consequences of its own negligence, and it cannot do so today except indirectly, as is pointed out in the Burke case, by a valuation agreement where a choice of rates is given.''

■ Our problem then becomes reduced to this question: Is there any difference between the case at bar and the case of liability of the carrier for checked baggage in a case where no graduated scale of valuation is allowed by the tariff? We have already seen that the articles in question were moving in interstate commerce at the time they were lost and that the liability of the carrier as such for the loss in some amount had attached thereto. We can think of no reason why there should be any difference between baggage in the custody of a porter as a servant of the carrier, and lost through his negligence, and baggage in the custody of a baggageman, likewise a servant of the carrier, and lost through his negligence. It seems clear on principle that the case before us is the same as though the baggage had been tendered for checking and lost in the process of checking or the shipper had been denied the right to secure full protection and had been given no alternative but to accept the limited valuation against negligence placed thereon by the carrier, which, as above shown, is illegal from its inception. This is not a case of joint control with the passenger nor a case where the passenger's conduct or negligence in any way contributed to the loss. It is a clear

case of loss by negligence where the control was exclusively in the carrier, who had allowed no opportunity to the shipper to secure better protection from loss or damage.

"With regard to hand baggage, the question of the duty and liability of the carrier seems ordinarily to depend upon who has the custody or control of the baggage. If the passenger has entire control and custody to the exclusion of the carrier, then the carrier cannot be held as an insurer, and will not be liable at all, unless guilty of negligence which results in its loss or damage, in the absence of contributory negligence on the part of the passenger. The element of the degree of control respectively exercised by the passenger and the carrier enters largely into the decisions in the American cases; and the degree of liability varies with the degree of possession." (5 R. C. L., sec. 795, p. 176.)

The case of *Great Western Ry. Co.* v. *Bunch*, 13 App. Cas. 31, *supra*, treats of both hand-baggage and checked baggage and is for that reason directly in point. There a porter labeled two articles of respondent and took all the luggage to the platform, the train not then being at said platform. Respondent told the porter she wished the bag put into a carriage with her and asked if it would be safe to leave it with him. It would be quite safe, he assured her, and he promised to take care of the luggage and put it into the train. She then went to get her ticket. Ten minutes after she had left the luggage she and her husband returned together to the platform and found that the two labeled articles had been put into the van of the train, but that the porter and the bag had disappeared. The court said: "If the view thus assumed is the correct view of the law, and I think it is, the moment the porters received Mrs. Bunch's luggage, whether van or hand-luggage, they received, for carriage to Bath, all the luggage of the passenger; they received the van-luggage to be put into the van; they received the hand-luggage to be put into the passenger carriage; and I think the learned judge was entitled to infer that their practice, and therefore their contract, in receiving hand-luggage, was to put it into the passenger carriage, or if the railway company did not then bring up the train to the platform, to take care of it until the carriage was drawn up and in a position to receive the hand-luggage, which, in

my view, the porter, as the agent of the railway company, had accepted and received for that purpose. . . .

"Further, it was contended that the contract as regards van-luggage is altogether distinct and different from the contract as regards hand luggage; that, in fact, there are two separate contracts, and that whatever may be the case as regards van-luggage, railway companies come under no liability of any sort as regards hand-luggage until it is placed in the passenger's carriage.

"I cannot think this view correct. The services rendered by railway porters in receiving passengers' luggage, in taking it to the platform, and putting it into the train, are part of the ordinary facilities for passenger traffic which the public nowadays expects from railway companies, and which railway companies for the most part hold themselves out as ready and willing to afford. These services are covered by the fare which the passenger pays for his journey. They are offered in view of the contract which a person who presents himself with luggage at a railway station presumably either has made or is about to make. The contract, as the case may be, runs from, or relates back to, the commencement of the journey; and the journey must, I think, be taken to commence, as regards passengers' luggage, at the time when the luggage is received by the company's servants for the purpose of the journey. Thenceforward the work done in taking the luggage to the platform, in putting it into the train, in conveying it to its destination, and there delivering it, must, I think, be regarded under ordinary circumstances as one continuous operation to be performed under the contract. The contract is the ordinary contract of common carriers—a contract to carry securely."

No strength is added to appellant's position because of the filing of this kind of a tariff with the Interstate Commerce Commission. As stated in *Boston etc. R. R. Co.* v. *Piper, supra:* "While this provision was in the bill of lading, the form of which was filed with the Railroad Company's tariffs with the Interstate Commerce Commission, it gains nothing from that fact."

As said in Roberts' Federal Liabilities of Carriers, volume 1, section 330a, pages 578, 579: "Contracts of shipment in contravention of the settled principles of the common law preventing the carrier from contracting against liability for

loss or damage resulting from his own negligence, are invalid. The fact that such contracts have been filed with the Interstate Commerce Commission does not modify this rule.''

Appellant cites many cases, however, to the effect that limitations may be made or authorized with respect to liability for baggage and that these regulations, when made, have the force of a statute and can only be overthrown by application in the manner required by law to the Interstate Commerce Commission. But these cases must be held inapplicable to agreements or contracts which undertake to provide in advance against the consequences of negligence of the carrier in violation of the common-law rule.

''Thus this valuation rule, where choice is given to and accepted by a shipper, is, in effect, an exception to the common-law rule of liability of common carriers, and the latter rule remains in full effect as to all cases not falling within the scope of such exception.'' (*Union Pac. R. R. Co.* v. *Burke, supra,* at pages 322, 323.)

This rule has been consistently applied in all the other federal jurisdictions (*A. C. Lawrence Leather Co.* v. *Compagnie Generale Transatlantique,* 12 Fed. (2d) 83; Idem, 18 Fed. (2d) 930; *Toyo Kisen Kabushiki Kaisha* v. *Willits & Co.,* 17 Fed. (2d) 762, 764). This position we understand appellant to concede.

These views render it necessary to give consideration to the contention of respondent that the limitation contained in the tariff with reference to red cap porter service does not purport, as a matter of construction, to be a provision attempting to limit its liability for negligence of itself or its porters. We have treated it as an express attempt to limit liability for loss due to its own negligence. If it does not mean this, then, of course, all the more reason exists for upholding the judgment of the court below.

Judgment affirmed.

Curtis, J., Richards, J., Shenk, J., Waste, C. J., Langdon, J., and Seawell, J., concurred.

Rehearing denied.

All the Justices present concurred.