**KOLT et al, Plaintiffs-Appellees, v. CLEVELAND TRUST CO., Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 21545.   Decided April 24, 1950.

M. O. Critchfield, S. J. Krohn, Cleveland, for plaintiffs-appellees.

McKeehan, Merrick, Arter & Stewart, Cleveland, for defendant-appellant.

### OPINION

By SKEEL, PJ.

This appeal comes to this court on questions of law from a judgment for the plaintiffs entered upon the verdict of a jury in the Court of Common Pleas of Cuyahoga County. The plaintiff's action was for the recovery of money which he alleged he had placed in the night depository or vault of the Superior and East 123rd Street branch office of the defendant, and when called for was not returned because it could not be found.

The plaintiff, a retail meat dealer, by virtue of a contract with defendant had been accustomed to using the night depository facilities of defendant at its East 123 and Superior Avenue branch to make deposits of money and checks after banking hours, the deposits being made usually on Saturday night and on nights just preceding holidays.

For the purpose of receiving night deposits, the bank had installed a night depository vault. There was a small metal door placed in the outer wall of the East 123rd Street side of the banking rooms. This door was fitted with a locking device which could be opened only by the use of a key but which could be locked shut simply by completely closing the door. On the inside of this opening there was a metal chute about three feet long which led into a safe within the banking rooms. The top of this chute located just inside the outer metal door above described had a swinging door placed horizontally across the top, constructed very much like the receiving door of a package or parcel mail box used by the United States Postoffice Department.

The manner in which the night depositor would make his deposit was by first opening the outside door by the use of a key furnished by the bank. He would then pull down the swinging inner door at the top of the chute which would bring up a shelf completely closing the end of the chute. He would then put his deposit on such shelf and release the inner door which would swing up, closing the chute and drop the shelf down so that when the door was closed the deposit would fall through the chute and into the vault or safe.

Entrance to the safe or vault was controlled by a combination lock which could only be used after it was unlocked by a key. The duty of unlocking this safe or vault at a specified time was delegated to two employees—one who had the key, and the other who was given the combination, both of whom were required to be present at all times when the vault door was opened.

The right to use the night depository facilities was controlled by contract. The plaintiff entered into a written contract with the defendant on Jan. 16, 1946, whereby for a consideration of twenty-five cents for each "sack placed in the night chute" with a minimum charge of $1.00 per month, the plaintiff was given the right to make use of the night deposit facilities of defendant at East 123 and Superior Avenue branch. The contract assigned to plaintiff key No. 24 to the outside door of the night chute and "Sack No. 29 and two keys thereto" in which to place deposits before putting them in the night chute. The contract in part provided:

"The undersigned hereby agrees to use the Night Depository Facilities only for overnight keeping of Sacks, which Sacks shall contain nothing other than currency or commercial paper, or both, and further agrees that a person authorized by the undersigned will call at the Bank to receive and receipt for said Sack(s) on the first banking day following each placing by or on behalf of the undersigned of any Sack in the Night Chute. Bank shall have no duty or obligation whatsoever to see that the contents or any part thereof of any Sack is tendered for deposit for credit to any account with Bank, nor to ascertain the contents or disposition of contents of any Sack receipted for by any authorized person. The undersigned expressly understands and agrees that each use or attempted use by the undersigned of the Night Depository. Facilities shall be at the undersigned's sole risk at all times and further expressly understands and agrees that the relationship of debtor and creditor between Bank and undersigned shall not arise out of any use or attempted use of the Night Depository facilities, each separate use by the undersigned of the Night Depository Facilities being deemed to have been completed each time any Sack hereinabove listed found in the Night Receptacle by Bank is receipted for by any authorized person."

The contract also provided who should call at the bank the next business day after the night deposit had been made and take possession of the deposit bag or sack. David T. Kolt and Alfred Rafal, in addition to Aaron A. Kolt, were so designated.

The sacks provided under the contract were provided with a padlock, the depositor holding the only key. The depositor would place his deposit in the sack, lock it and then with the use of the key to the night chute, deposit it as above described. When the bank opened the next business day, the

employees designated would open the night deposit vault in the presence of each other and one would take out the sacks and the other would make a record of the number of each bag or sack thus found in the night vault and the bag or sack would then be taken to the cashier's cage of the one holding the key to the night vault, there to await being called for by the several depositors.

The plaintiff's petition alleges that on the night of March 15, 1947 he, with Alfred Rafal, placed a deposit of money and checks, totalling $1772.00 in Sack No. 29 together with Rafal's deposit of a smaller amount and together they went to the bank, unlocked the outer door, opened the chute, placed the sack which was then wrapped in a paper bag, on the shelf of the inner door, shut the inner door so that the sack would fall into the vault below and then locked the outer door and departed.

On March 17, 1947, at about 10 o'clock A. M., Rafal called at the bank to get the sack but it was not to be found nor was there any record of Sack No. 29 being found with the other night deposits.

Upon trial, the court charged the jury that the only question for their consideration is whether or not the plaintiff had established by a preponderance of the evidence that he had placed the deposit in the night deposit vault. The court's charge was in part as follows:

"If after finding that the plaintiffs have proven to you by a preponderance of the evidence that this depository bag actually went into the mouth of that chute and thereby entered the possession of the bank; if then, following that proof by the plaintiffs the defendant has failed to meet the presumption which arises, by showing you that it exercised ordinary care in the care and custody of the bag, then the plaintiffs are entitled to recover in this controversy, if the plaintiffs have proven to you by a preponderance of the evidence that this depository bag went into the mouth of that chute and into the possession of the bank. But that presumption having arisen against the bank, if the bank has met that presumption by showing you that it did exercise ordinary care in the manner of its care and custody of that bag, then again your verdict should be for the defendant. Those are the issues for you to determine, and those are the important issues. There was a contract made by and between the Kolt Brothers and the Cleveland Trust Company, which is in evidence and which will be with you in your jury room. I will say to you now, as a matter of law, that no

provision of any kind in that contract can change or alter in the least these rules of law which I have heretofore given you regarding the law in this case."

At the conclusion of the taking of the evidence the defendant requested the court to give the following instructions, which request was presented in writing as provided by §11420-1 GC.

"I say to you, as a matter of law, that the burden of proof is upon the plaintiff to prove by a preponderance of the evidence that the defendant received in its possession night depository sack No. 29 on the date in question. If you do not find by a preponderance of the evidence that the defendant did receive night depository bag No. 29 on that date in question then your verdict must be for the defendant."

The court refused the request to which exceptions were taken.

The defendant claims the following errors:

"1. The trial court erred in overruling the motion for a directed verdict at the close of plaintiff's evidence and renewed at the close of all the evidence.

2. The trial court erred in overruling defendant's motion for judgment notwithstanding the verdict.

3. The trial court erred in overruling defendant's motion for a new trial."

If, in fact, the night deposit bag or sack of the plaintiff was placed in the night deposit chute, in the proper manner, the relationship between the bank and plaintiff, from such time as a night deposit was so placed in the chute until it was subsequently returned to the depositor as provided by the terms of the contract, was that of bailor and bailee. This is so because by the terms of the contract the bank furnished the plaintiff with a key with which to operate the night deposit door in taking advantage of the night deposit facilities. The bank therefore would be held to have accepted a deposit made in accordance with the terms of the contract, which acceptance created the bailor-bailee relationship. Such a relationship of bailor and bailee would continue until the bailor or his duly constituted representative, called for it as provided by the contract. As soon as the bailor or his representative received it, the relationship of bailor and bailee would be at an end and if the contents

of the bag was then deposited, the relationship of debtor and creditor would be created.

It is defendant's contention that by the provisions of §710-110 GC, the bank is empowered to contract with respect to the use of its night deposit vaults upon such terms and conditions as it may prescribe. And that by the contract (in part above quoted) deposits made thereunder were to be at the depositor's risk.

Sec. 710-110 GC provides as follows:

"A bank may receive on deposit for safe-keeping in its vaults and safes, or in the vaults and safes of another bank in this state, securities, stocks, bonds, coins, plate, jewelry, books, papers, documents and other valuable papers and property upon such terms and conditions as it may prescribe."

This statute seems broad enough to include the right of a bank by contract to provide upon what terms it will make available facilities for making deposits in night deposit vaults to be used during the time when the bank is not open. But if by strict interpretation it should be construed not to extend its provisions to night depositories, this section of the General Code of Ohio at least establishes a legislative policy to permit banks to enter into contracts limiting common law liability with respect to securities deposited with it for safe keeping in its vaults. Such a service is one rendered in the interest of a customer who would otherwise be compelled to face the risk that attends the possession of large sums of money in the night season in the regular conduct of his business.

Of necessity, no one representing the bank is present when a night deposit is made. Whether such deposit has actually been made must be established in every event by the evidence of the depositor. It would therefore be a very natural position of the bank to take that until the sack is actually accounted for by the bank's clerks in the ordinary procedure of accounting for night deposits sacks, such deposits should be at the risk of the depositor. Such a contract is not void as against public policy.

That such a limitation by contract is not against public policy is indicated in the case of Bernsteen v. Northwestern National Bank of Phila. 157 Pa. Sup. Ct. 73, 41 A. (2d) 440. The first paragraph of the headnotes provides:

"A bank in furnishing a night depository service may enter upon a contract relation with depositors on mutually acceptable terms defining banks liability within legal limits in case of loss."

In this case no such contract had been entered into so that the ordinary rules of bailment were used in fixing the liability of the bank, but on page 441 the court said:

"The purpose of the device was to furnish the facilities for making a general deposit. The bank might have, but it did not enter upon a contract relation with plaintiffs on mutually acceptable terms (9 C. J. S. Banks & Banking, Sec. 267; Burrill v. Dollar Savings Bank, 92 Pa. 134, 37 Am. Rep. 669) defining its liability within legal limits in the event of loss. In the absence of such limiting agreement the law will imply from the making of the deposit in this case that the relation ultimately intended was that of debtor and creditor."

Where the circumstances are such that the possession of another's property is attended with unusual risks, the parties dealing at arm's length as free agents may lawfully make any reasonable provision therefor as the circumstances justify.

Contracts relieving the promisor from liability even for his negligence have been upheld on the broad grounds of freedom of contract guaranteed by the federal and state constitutions. For example, as between landlord and tenant, it has been held that the relationship is not a matter of public interest but relates exclusively to the private affairs of the parties concerned and that the two parties stand upon equal terms. 175 A. L. R. 87, parag. 46. Perry v. Payne, 217 Pa. 252; Kirschenbaum v. General Outdoor Adv. Co. 258 N. Y. 489.

In the last cited case the court said:

"Stipulations between a landlord and tenant, determining which shall bear a loss arising from non repair or mis-repair of the tenement and which shall be immune, are not matters of public concern. Moreover, the two stand upon equal terms; neither the one nor the other is under any form of compulsion to make the stipulation; either may equally well accept or refuse entry into the relationship of landlord and tenant. We think it clear that public policy does not condemn the immunity clause voluntarily agreed upon by the parties."

The right of the bank to immunity from whatever cause except its wilful wrong-doing in furnishing night deposit

services under the terms of an exculpatory agreement is supported in theory at least by the almost universal rule that a common carrier (railroad) may by contract relieve itself from liability even for its negligence or that of its servants or employees in the construction and use of private sidings and spur tracks. 175 A. L. R. 100 parag. 51. In the case of Mann v. Pere Marquette R. R. Co. 135 Mich. 210, which was concerned with a contract exempting the carrier from loss resulting from the negligent operation of its locomotive over a railroad side track, the court said:

"This case does not fall within those where contracts to exempt from liability are held void on the ground of public policy. It is a fundamental rule of law that what one may refuse to do entirely, he may agree to do upon such terms as he pleases. In contracting to put in those side tracks the defendant was not acting in the capacity of a common carrier. It was under no legal obligation to put them in. It might have refused. There was no occasion to contract against properly equipped and properly managed engines for fire caused by such would not create any liability. The only purpose for such was to avoid the consequences of its own negligence and to avoid lawsuits growing out of alleged negligent acts. It had a perfect right both in reason and authority to contract against such liability."

The case law of bailment supports the same principles of law. Again quoting from 175 A. L. R. p. 110, parag. 55 the author says:

"The modern development of the law of bailments and its extension to many new and varied transactions as a result of the increasing complexity of today's commercial relationships is reflected accurately in the position the courts take in regard to the exculpatory clauses found so frequently in bailment contracts. While the right of the ordinary bailee to make a contract exempting him from liability due to his negligence or the negligence of his employees is recognized with practical unanimity, a strong tendency to hold such contracts void as violative of public policy is noticeable in the decisions of the courts which deal with contracts of bailment for hire entered into by the bailee in the course of a general dealing with the public; and this tendency becomes more pronounced the more recent the decisions, although there is still respectable authority for the view that such provision may be valid against all but gross negligence. Bailees of the second type as this term is

understood here, are persons who make it their principal business to act as bailee and who deal with the public on a uniform and not an individual basis as evidenced by the fact that their contracts as a rule are printed on identification tokens or are posted in their place of business. The chief representatives of this type of bailees are owners of parcel checkrooms, owners of parking places, garagemen and warehousemen."

Upon the above authority, the case of **Insurance Co. v. Constantine, 144 Oh St 275,** is to be distinguished from the instant case. The Constantine case involved one engaging exclusively in the business of parking automobiles for hire. It is not to be presumed that the Supreme Court by its holding in the Constantine case on the question of limiting liability intended to exclude on the ground of public policy, all contracts which limit the common law liability of an ordinary bailee for hire. This must be true especially in cases involving safe deposit vaults because of the legislative policy indicated by §711-110 GC supra.

It must be likewise noted that the Supreme Court in the Constantine case, supra, or in the case of **Hotel Statler Co. Inc v. Safier, 103 Oh St 638,** did not overrule or modify its holding in the case of **Insurance Co. v. Railway Co. 74 Oh St 30.** In this case the right of a railroad company to stipulate as a provision of the lease that it would not be liable for any loss caused by the lessee by fire accidentally or negligently communicated to the property by the railroad company lessor through the acts of its agents or servants was considered. The property of the railroad company lessor about which the lease dealt was adjoining the right of way of the defendant's railroad so that fire was an everpresent danger. The court said:

"1. A stipulation in a lease made by the railroad company that the lessee is to exonerate it from all liability for damages by fire to any property or structure on the demised premises, which in the operation of the railroad may be accidentally or negligently communicated to it, is not void as against public policy.

2. Such lessee and his insurers cannot recover from the railroad company the amount of the loss by fire to a building and its contents owned by the lessee and located partly on such premises when in the operation of the railroad the fire was communicated to that part of the building on the demised premises."

The right of a bailee to relieve itself from liability for its own negligence in the execution of the bailment contract considered in the note in 175 A. L. R. supra, especially where the bailee is a so-called "professional" bailee, has to do with his liability in the management and control of the goods and where there is no issue as to the receipt of the goods. This is likewise true with regard the cases therein considered where the courts place a strict construction upon the contract limiting the liability of the bailee (unless the provisions of the contract are so clear and unambiguous as to leave no doubt as to the meaning of the exculpatory clause) that the words of limitation were not intended to include relief from the bailee's negligence. But the instant case is not concerned with property admittedly in the possession of the bailee. Here the primary consideration is as to whether the "deposit sack" actually came into the possession of the defendant at all.

The method devised by the defendant for safeguarding deposit sacks properly placed in the night deposit chute exemplified a high degree of care and protection for the property of depositors, and the manner in which these precautions were carried out on the first business day after the claimed use of the night deposit facilities by the plaintiff is not refuted by the plaintiff except by his claim that the deposit sack was put in the chute.

The plaintiff's action is upon the contract, the terms of which places the risk upon him until actually receipted for. As indicated, the manner in which night deposits must of necessity be made, should permit the defendant to protect itself within reasonable limits.

We conclude, therefore, that the court's charge entirely eliminating the contract from the consideration of the jury, was in error as were the rulings of the court on the motions for judgment.

Having come to the foregoing conclusion, it is unnecessary to consider the error claimed for the refusal to charge as requested before argument other than to say that the charge as requested was a correct statement of law upon an issue presented by the pleadings and evidence in the charge and should have been given.

For the foregoing reasons, therefore, the judgment of the Common Pleas Court is reversed and final judgment entered for the defendant. Exc. Order see journal.

HURD, J, concurs.
McNAMEE, J, dissents. (See dissenting opinion)

## DISSENTING OPINION

By McNAMEE, J, (dissenting)

As I understand the views of the Supreme Court on the subject, there is no legal inpediment against giving effect to the special contracts that limit the degree of liability of an ordinary bailee for loss occasioned by its negligence, but a bailee by special contract may not **exonerate** itself from liability occasioned by its own negligence.

In **Hotels Statler v. Safier, 103 Oh St 638, 646,** the following statement appears in the opinion by Jones J:

"Ordinarily in bailments the parties may diminish the liability of the bailee by special contract, provided the contract is not in violation of law or of public policy and does not relieve the bailee of negligence."

Immediately following the above, Judge Jones added:

"But in the instant case no such special contract was made, and in the absence of a special agreement the law of bailments fixes the degree of the bailee's liability."

This latter statement implies clearly that where no prohibitions of law or considerations of public policy intervene, parties to a bailment may by special contract limit the degree of the bailee's liability for its own negligence. However, the express declaration against the validity of a contract that exempts a bailee from liability for negligence that appears in the Statler case is approved and amplified in **Agricultural Ins. Co. v. Constantine 144 Oh St 275,** where at page 283 of the opinion the court said:

"It is now apparently well settled that a bailee for hire cannot, by contract, exempt himself from liability for his own negligence or that of his agents or servants (Franklin & So. Pacific Co. 203 Cal. 680, 265 P. 936, 59 A. L. R. 118; **Hotels Statler Inc. v. Safier, 103 Oh St 638,** 134 N. E. 460, 22 A. L. R. 1190; Scott Auto & Supply Co. v. McQueen, 111 Okla. 107, 226 P. 372, 34 A. L. R. 162; Simms v. Sullivan, 100 Ore. 487, 198 P. 240, 15 A. L. R. 678; Sporsem v. First Nat'l Bank of Poulsbo, 133 Wash. 199, 233 P. 641, 40 A. L. R. 854."

In Sporsem v. First National Bank of Poulsbo, supra, the bank leased a safe deposit box to the plaintiff. The contents of the box were lost through a burglary. The Bank, among

other defenses, claimed exemption from liability by virtue of the clause in the contract with the depositor that it "assumes no liability whatever for any loss or damage that may occur." The Court answered this contention by the statement that "It is now apparently well-settled that a bailee for hire cannot exempt himself from liability for his own negligence."

In the instant case, the clause relied on by the bank is:

"The undersigned expressly understands and agrees that each use or attempted use by the undersigned of the Night Depository facilities shall be at the undersigned's sole risk at all times * * *."

If there be any significant difference between the purport of this provision and the exculpatory clause in the Sporsem case, I am unable to perceive it.

In Agricultural Ins. Co. v. Constantine, supra, the exculpatory clause read:

"No attendant on duty after regular closing hours. Cars left after closing at owner's risk. This station will endeavor to protect the property of its patrons, but it is agreed that it will not be liable for loss or damage of cars, accessories or contents, from whatever cause arising."

Observing that the above language is broad enough to avoid liability for wanton or wilful misconduct of the appellee the court said:

"The attempted limitation of liability here under consideration cannot be upheld either upon reason or authority, whether it applied during regular business hours or only after closing time."

The statements in the opinions of the Safier and Constantine cases as hereinabove quoted were not carried into the syllabi of the cases in which they appear. But they are authoritative expressions of the court on important legal principles. Unless they are to be rendered devoid of meaning they ought to serve as reliable guides to proper judicial action in cases where the principles discussed are decisive of the issues presented. If this be not so, it is for the Supreme Court and not this Court to say.