[No. B022017. Second Dist., Div. Five. Dec. 29, 1987.]

CONTINENTAL INSURANCE COMPANY, Plaintiff and Appellant,
v.
AMERICAN PROTECTION INDUSTRIES, Defendant and
Respondent.

COUNSEL

Daniel R. Berke and Jaquelynn C. Pope for Plaintiff and Appellant.

Vars, Pave, McCord & Freedman and Thomas S. Amato for Defendant and Respondent.

## OPINION

**NEBRON, J.***—This is an action brought by Continental Insurance Company (Continental) against American Protection Industries (API) for recovery of losses sustained by Continental as a result of monies it was required to pay its insured and coplaintiff Fantastic International of California (Fantastic), in compensation for losses Fantastic suffered as a result of two burglaries of its warehouses.

In their first amended complaint, plaintiffs[1] allege four causes of action: (1) negligence; (2) breach of contract; (3) fraud and deceit; (4) recision and restitution.

More than two years after the filing of the amended complaint, API moved for summary judgment against plaintiff Continental. Continental opposed the motion and also moved to amend its complaint to include a cause of action specifically entitled "Gross Negligence" alleging additional facts in support of the added cause of action.

The trial court granted API's motion for summary judgment and denied Continental's motion to amend the complaint. Subsequently, Continental filed a motion for new trial on the same issues before the court on the summary judgment motion and also filed a motion for reconsideration under section 1008, subdivision (a) of the Code of Civil Procedure requesting the court to reconsider its ruling on the motion to amend. The motions were denied.

Continental asserts two arguments: (1) The trial court erred in granting the motion for summary judgment, Continental contending that it should be subrogated to the rights of its insured on the cause of action for fraud and deceit;[2] (2) the trial court erred in denying the motion to amend the complaint to include the cause of action for gross negligence.

### STATEMENT OF FACTS

In June 1972, respondent API contracted with Fantastic to install and maintain an alarm system for Fantastic's warehouse and premises located at 15813 Stagg Street, Van Nuys, California. Over the years, the burglar alarm system was updated and supplemented through four subsequent contracts between the parties. Additional alarm protection was provided for the warehouse at 15821 Stagg Street which adjoined Fantastic's building at 15813

---

* Assigned by the Chairperson of the Judicial Council.
[1] Fantastic is not a party to this appeal.
[2] Appellant does not dispute the trial court's ruling as to the other causes of action.

Stagg Street. The final contract, which is the subject of this litigation, was dated May 1, 1981. Under the terms of that contract, API agreed to install new alarm equipment which would utilize a transponder rather than transmitters as had been used under the terms of all the previous agreements.

The transponder was a superior system, as a cut telephone line on the transponder system would cause the alarm to sound in API's central office whereas the older transmitter system would signal only upon break-ins.

The May 1, 1981, contract required that API connect the warehouse building at 15821 Stagg Street to the alarm in the main building at 15813 Stagg Street.

Fantastic agreed to pay $875 for the installation of the new equipment and, in addition, $275.50 each month for rental of the equipment as well as for API's services in monitoring the signals from the transponder. API represented that it had performed the required services and billed Fantastic the installation charges for the new equipment. Further, API proceeded to bill $275.50 every month thereafter. The installation charges and all monthly bills were paid.

Each evening as the premises were vacated Fantastic would set the alarm equipment in its operational mode.

During the weekend of September 18, 1982, Fantastic's Stagg Street premises were burglarized. Investigation showed that the burglars entered through the 15821 premises. Subsequent to the burglary, Fantastic learned that those premises had never been connected to the alarm equipment at the 15813 building; further, that the 15821 premises had not been protected since May 1981, when API disconnected the old system.

Less than a month later, there was another burglary of the Stagg Street premises. It was after this second burglary that Fantastic terminated its contract with API and contracted with another company for new alarm equipment. During the replacement of the API equipment, Fantastic first learned that API had not provided the transponder system called for in the May 1, 1981, contract.

## ISSUES

1. Did the trial court err when it granted API's motion for summary judgment as to appellant on the cause of action for "Fraud and Deceit"?

2. Do our courts recognize a cause of action for "gross negligence"?

## DISCUSSION

### DID THE TRIAL COURT ERR WHEN IT GRANTED API'S MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT ON THE CAUSE OF ACTION FOR "FRAUD AND DECEIT"? NO.

In this case, Continental has joined with its insured in prosecuting a cause of action for fraud and deceit.[3] Appellant's position is that its interests should be subrogated to those of its insured. API contends that Continental has no standing to pursue an action in fraud against API where Fantastic has filed its own lawsuit stating a cause of action for the same alleged fraud; that the alleged fraud, if any, was perpetrated by API upon Fantastic and not Continental.

In *Knight* v. *Alefosio* (1984) 158 Cal.App.3d 716 [205 Cal.Rptr. 42], the plaintiff purchased a contract of insurance from Farmers Insurance Exchange. Plaintiff was involved in an automobile accident which occurred

---

[3]The pertinent text of the cause of action is as follows: "20. From May 1, 1981 to and including September 18, 1982, defendants, and specifically defendant's representative Betty Shepard, and DOES 1 through 15, falsely represented to plaintiff, FANTASTIC INTERNATIONAL OF CALIFORNIA, through its agent and controller, David Wronski, among others that it had properly installed a burglar alarm system on the premises located at 15813-15821 Stagg Street, Van Nuys, California.

"21. The representations of defendants, and each of them, were in fact false in that the system had never been properly installed for over a period of fifteen (15) months and specifically on September 18, 1982 and October 4, 1982.

"22. Defendants, and each of them, made these representations with no reasonable ground for believing them to be true, in that defendants, and each of them, had knowledge of a problem in the alarm system prior to September 18, 1982, by virtue of the removal of a telephone line linking the system and actual removal of a transmitter. Additionally, plaintiffs were informed and believe, and thereon allege, that defendants, and each of them, did not have accurate information nor any information concerning the alarm system, and that defendants were aware that without such information it could not accurately make the representations herein alleged; at the time of the making of these representations, and at all times thereafter until on or about October 19, 1983, defendants, and each of them, concealed from plaintiffs its lack of information and its consequent inability to make the alleged representations accurately.

"23. These representations were made by defendants, and each of them, with the intent to induce plaintiffs to act in the manner herein alleged.

"24. Plaintiffs, at the time these representations were made by defendants, and at the time plaintiffs took the actions herein alleged, were ignorant of the falsity of defendants' representations and believed them to be true. In reliance on these representations, plaintiffs were induced to and did allow their premises to go unprotected from burglary and theft. Plaintiffs' reliance on defendants' statements was justified in that defendant was in the business of providing alarm services and plaintiffs had no reason to suspect that the alarm system was not properly installed.

"25. As a proximate result of defendants' misrepresentations and the facts herein alleged, plaintiffs were damaged when unknown individuals burglarized plaintiff, FANTASTIC INTERNATIONAL OF CALIFORNIA'S business premises and stole merchandise, by reason of which plaintiffs were damaged in a sum of [*sic*] excess of $150,480.17."

August 17, 1979. Plaintiff filed a personal injury action against the driver of the other vehicle involved. Plaintiff's demand included a claim for loss of income.

Pursuant to the terms of the insurance policy issued by the company, continuation benefits were paid to the insured in the amount of $3,900. No other losses or damages were payable under the policy. The insurance company sought leave to intervene, arguing, among other matters, that the doctrine of equitable subrogation was applicable. The appellate court affirmed the lower court's ruling denying appellant's right to intervene stating that the doctrine of equitable subrogation did not apply.

 "The usual application of equitable subrogation has been as a device to achieve a just result by clothing a party with a right to recovery where he would otherwise be defeated by lack of privity. (*Transit Casualty Co.* v. *Spink Corp.* (1979) 94 Cal.App.3d 124, 132 [156 Cal.Rptr. 360].) Equitable subrogation is a legal device which permits a party who has been required to satisfy a loss created by a third party's wrong to step into the shoes of the loser and recover from the wrongdoer. (*Offer* v. *Superior Court* (1924) 194 Cal. 114, 118-119 [228 P. 11]; *Transit Casualty Co.* v. *Spink Corp., supra,* at p. 132.)" (*Knight* v. *Alefosio, supra,* 158 Cal.App.3d at p. 724.)

"The doctrine has been applied where the insured has already been made whole by the insurance company and the insurer is proceeding against the individual responsible for the loss. Although there is language in the cases that indicate that it is a doctrine which stands on its own without the necessity for any contractual provision, there appears no decided instance where intervention has been permitted under this theory while the insured is actually pursuing a lawsuit against a person claimed responsible." (*Id*. at p. 725).

"Where the insured is a party plaintiff in an action against a third party tortfeasor, and no contractual right of subrogation is in evidence or admitted by the parties, we are aware of no case where the right of equitable subrogation has been applied, and we decline to apply it here." (*Id*. at p. 726.)

The reasoning in the *Knight* case is also applicable to the facts presented by the case at bench. The motion for summary judgment was correctly decided.

## Do Our Courts Recognize a Cause of Action for "Gross Negligence"? No.

■ Appellant contends that it should have been permitted to amend the complaint to allege a cause of action based upon gross negligence. As authority for its position, appellant relies upon language in *Fireman's Fund Ins. Co.* v. *Morse Signal Devices* (1984) 151 Cal.App.3d 681 [198 Cal.Rptr. 756]. *Fireman's* was decided after the trial judge in this case granted the motion for summary judgment. Thereafter, appellant amended its pleadings to allege such cause of action. Specifically, appellant relies on the following sentence from the *Fireman's* opinion: "While the liquidated damage provisions[4] would not limit the Alarm Companies' liability in the event of gross

---

[4]Paragraph 20 of the agreement between Fantastic and API is as follows: "20. COMPANY IS NOT AN INSURER, LIQUIDATED DAMAGES, LIMITATION OF LIABILITY It is understood and agreed: That Company is not an insurer that insurance, if any, shall be obtained by Subscriber; that the payments provided for herein are based solely on the value of the service as set forth herein and are unrelated to the value of the Subscriber's properly or the property of others located on subscriber's premises; that Company makes no guaranty or warranty, including any implied warranty of merchantability or fitness that the equipment or services supplied will avert or prevent occurrences or the consequences therefrom which the system or service is designed to detect or avert. Subscriber acknowledge that it is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from a failure to perform any of the obligations herein, including, but not limited to installation, service, maintenance or monitoring or the failure of the system to properly operate with resulting loss to Subscriber because of, among other things: [¶](a) The uncertain amount or value of Subscriber's property or the property of others kept on the premises which may be lost, stolen, destroyed, damaged or otherwise affected by occurrences which the system or service is designed to detect or avert;

"(b) The uncertainty of the response time of any police or fire department, should the police or fire department be dispatched as a result of signal being received or an audible device sounding;

"(c) The inability to ascertain what portion, if any, of any loss would be proximately caused by Company's failure to perform or by its equipment to operate;

"(d) The nature of the service to be performed by Company.

"Subscriber understands and agrees that if Company should be found liable for loss or damage due from failure of Company to perform any of the obligations herein, including, but not limited to, installation, maintenance, monitoring, service or equipment in any respect whatsoever Company's liability shall be limited to a sum equal to the total of six (6) monthly payments or Two Hundred Fifty ($250.00) Dollars, whichever is the lesser, as liquidated damages and not as a penalty and this liability shall be exclusive, and that the provisions of this Section shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property, from performance or nonperformance of the obligations imposed by this contract, or from negligence, active or otherwise, of Company, its agents, servants, assigns or employees.

"If Subscriber wishes Company to assume a limited liability in lieu of the liquidated damages as hereinabove set forth, Subscriber may obtain from Company a limitation of liability by paying an additional monthly service charge to Company. If Subscriber elects to exercise this option a rider shall be attached to this Agreement setting forth the terms, conditions and amount of the limited liability and the additional monthly charge. Such rider and additional obligation shall in no way be interpreted to hold Company as an insurer."

negligence, the allegations of Fireman's are insufficient to state a cause of action for gross negligence." (*Id*. at pp. 690-691.) The language is dicta and is not binding on this court.

Numerous California cases have discussed the doctrine of gross negligence. Invariably these cases have turned upon an interpretation of a statute which has used the words "gross negligence" in the text.[5]

Our research reveals but one case which seems to accept a doctrine of gross negligence without referencing the holding to a specific statute. That case, decided almost 100 years ago, is *Redington* v. *Pacific P.T.C. Co*. (1895) 107 Cal. 317, 40 P. 432,[6] and is not persuasive today.[7]

---

[5] *Cooper* v. *Kellogg* (1935) 2 Cal.2d 504, 510-511 [42 P.2d 59] interpreting the language of section 141¾ of the Vehicle Code in effect in 1930—commonly known as the "guest statute"; to the same effect see *Krause* v. *Rarity* (1930) 210 Cal. 644, 652 [293 P. 62, 77 A.L.R. 1327]; *Kastel* v. *Stieber* (1932) 215 Cal. 37 [8 P.2d 474]; *Malone* v. *Clemow* (1931) 111 Cal.App. 13 [295 P. 70]; *Albers* v. *Shell Company* (1930) 104 Cal.App. 733 [286 P. 752]. Likewise, in *Walther* v. *Southern Pacific. Co*. (1911) 159 Cal. 769 [116 P. 51], the court was interpreting the language of Civil Code section 2175; see also *Pratt* v. *Western Pac. R.R. Co*. (1963) 213 Cal.App.2d 573 [29 Cal.Rptr. 108]; *Franklin* v. *Southern Pac. Co*. (1928) 203 Cal. 680 [265 P. 936, 59 A.L.R. 118]; and in *Hawaiian Pineapple Co*. v. *Ind. Acc. Com*. (1953) 40 Cal.2d 656 [255 P.2d 431], the court was interpreting language of Labor Code section 4553.

[6] It is of interest to us that appellant cites *Redington* in its reply brief in support of its motion to amend before the law and motion department, but does not cite the case in its briefs filed in this court.

[7] "A different, and older, approach has recognized distinct 'degrees' of negligence itself, which is to say degrees of legal fault, corresponding to required 'degrees' of care. This idea was borrowed from the Roman law [fn. omitted] in 1704 by Chief Justice Holt in a bailment case, [fn. omitted] and given support by learned writers on the law of bailments. [Fn. omitted]. It recognizes, in general, three 'degrees' of negligence: slight negligence, which is failure to use great care; ordinary negligence, which is failure to use ordinary care; and gross negligence, which is failure to use even slight care. [Fn. omitted.] The doctrine has received considerable acceptance, and is followed to some extent in the field of bailments. [Fn. omitted.] A few courts have extended it to other situations, particularly in holding that an automobile driver is not liable to a gratuitous guest except for gross negligence. [Fn. omitted.] Late in the nineteenth century there were experiments in Illinois [fn. omitted] and Kansas, [fn. omitted] which extended the doctrine to all negligence cases. These courts found themselves deluged with appeals and struggling in impossible confusion, [fn. omitted] and finally repudiated and overruled the whole theory. [Fn. omitted.]

"Although the idea of 'degrees of negligence' has not been without its advocates, [fn. omitted] it has been condemned by most writers, [fn. omitted] and, except in bailment cases, [fn. omitted] rejected at common law by most courts, [fn. omitted] as a distinction 'vague and impracticable in [its] nature, so unfounded in principle,' [fn. omitted] that it adds only difficulty and confusion to the already nebulous and uncertain standards which must be given to the jury. The prevailing rule in most situations is that there are no 'degrees' of care or negligence, as a matter of law; there are only different amounts of care, as a matter of fact. [Fn. omitted.] From this perspective 'gross' negligence is merely the same thing as ordinary negligence, 'with the addition,' as Baron Rolfe once put it, 'of a vituperative epithet.' This much-quoted phrase may be a bit unfair, since it is not difficult to understand that there are such things as major or minor departures from reasonable conduct; but the difficulty of classification,

Since *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393] established the doctrine of comparative negligence, the need for categorization of misconduct into degrees has been radically diminished. Thus, in *Sorensen* v. *Allred* (1980) 112 Cal.App.3d 717 [169 Cal.Rptr. 441, 10 A.L.R.4th 937], the court in an analogous situation, discussed the modern trend in favor of doing away with distinctions between various degrees of fault as follows: "We are here not comparing apples and oranges as respondent suggests but rather two varieties of oranges (simply negligence versus gross neglience) or at worst oranges and lemons, since the underlying comparison is being made between two types of negligence which the jury found to be almost equal in causing the accident.

"In summary, we conclude that no defensible reason exists for categorizing wilful and wanton misconduct as a different kind of negligence not suitable for comparison with any other kind of negligence. . . . We apply an old axiom, *'when the need for a rule ceases the rule ceases.'* [Emphasis added.]

"The important byproduct of the abolition of shades of negligence or other categorizations of fault would be the streamlining of the trial of cases. . . . The greater the elimination of such 'buzz' words as wilful misconduct, last clear chance, [assumption of risk], etc., the more the focus will be upon the real issues. . . ." (*Sorensen* v. *Allred, supra,* 112 Cal.App.3d at pp. 725-726.) Similarly, in light of the adoption of the doctrine of comparative negligence in California, any attempt to categorize gross negligence separately from ordinary negligence is unnecessary.

The trial court correctly denied the motion to amend.

The judgment is affirmed.

Feinerman, P. J., and Ashby, J., concurred.

---

because of the very real difficulty of drawing satisfactory lines of demarcation, together with the unhappy history, justifies the rejection of the distinctions in most situations." (Prosser & Keeton on Torts (5th ed. 1984) § 34, pp. 209-211; see also Elliott, *Degrees of Negligence* (1933) 6 So.Cal.L.Rev. 91.)