MANN *v.* PERE MARQUETTE RAILROAD CO.

1. RAILROADS—SIDE TRACKS — CONTRACTS — PUBLIC POLICY — EXEMPTION FROM LIABILITY FOR NEGLIGENCE.

> A contract by a railroad company with a shipper to build a side track, which exempts it from liability for loss by fire resulting from its own negligence, is not void on the ground of public policy, since in putting in the side track it was not acting as a common carrier, and might make such terms as the parties could agree upon.

2. SAME—ACCIDENTAL FIRES.

Fire caused by a properly equipped and managed railroad engine creates no liability.

3. SAME—INSTRUCTIONS.

Where a railroad company, by the terms of a contract with a shipper for the construction of a side track, was exempted from liability for loss by fire due to its negligence, it was error for the court, after reading the contract to the jury, to instruct them that it was for them to determine whether the loss sued for came within the contract, without also instructing them that the contract relieved the railroad company from its negligent acts.

4. CONTRACTS—CONSTRUCTION—SIDE TRACKS—"VICINITY."

A contract exempting a railroad company from liability for loss by fire of any property "situated or hereafter placed in the vicinity" of a side track to be built under the terms of the contract, was intended to cover any property situated in the mill and lumber yard which the track was to accommodate, and the question whether lumber situated in such yard was in the vicinity of the track when burned was not for a jury to decide.

5. SAME—FIRES—COMBUSTIBLE MATERIAL.

A provision in a contract that plaintiffs should keep the grounds adjacent to a side track "reasonably free and clear of inflammable and combustible material," so as to prevent fires starting from sparks of engines, was not complied with, where for a year there had been allowed to remain on the premises a pile of sawdust, shavings, and small pieces of boards, nearly a foot deep, extending 400 feet along the track and 40 feet distant therefrom.

6. SAME—EXEMPTION OF RAILROAD FROM LIABILITY.

A contract by a railroad company to build a side track for a shipper, which exempted the company from liability for loss to property in the vicinity of the side track by fire due to its negligence, exempted it from liability for fire caused by sparks escaping from an engine while entering upon a track leading to the side track, solely for the purpose of switching cars for the shipper.

7. RAILROADS—SWITCHING—FIRES—CONTRIBUTORY NEGLIGENCE.

It was negligence for plaintiffs' foreman, knowing that defendant's engine threw sparks that would set fires, to secure the engine, in a time of high wind, to do switching in a yard covered with dry shavings and other combustible materials.

Error to Muskegon; Russell, J. Submitted October 7,. 1903. (Docket No. 4.) Decided December 22, 1903.

Case by Robert K. Mann and William G. Watson, co-- partners as Mann, Watson & Co., against the Pere Mar- quette Railroad Company, for damages caused by fire communicated from defendant's engine. From a judg- ment for plaintiffs, defendant brings error. Reversed.

Plaintiffs are lumbermen, and own a large mill plant near Muskegon. Desiring to have a side track on each side of their mill for the purpose of shipping in and ship-- ping out products, they applied to the defendant to put in such tracks. Thereupon the following contract was exe- cuted by them :

" Agreement, made this ninth day of November, A. D. 1901, between R. K. Mann and W. G. Watson, both of Muskegon, Michigan, and doing business under the name of Mann, Watson & Company, hereinafter for convenience called the first party, and the Pere Marquette Railroad Company, hereinafter called the second party :

" The first party hereby requests the second party to construct two side tracks, to be located at Muskegon, Muskegon county, Michigan, No. 1 connecting with the South Horn track about 200 feet east of location stake 45, and extending westerly about 580 feet, No. 2 connecting with the Brewery siding about 300 feet west of location stake 30, extending easterly 300 feet, for the convenience of the first party in receiving and shipping freight. In consideration of the representations, promises, and under- takings of the first party, and upon the conditions and with the reservations hereinafter stated, the second party hereby agrees to comply with such request as soon as practicable after the execution of this agreement.

" Wherefore, this writing witnesseth :

" 1. Said side tracks shall be constructed substantially according to the plan hereto attached, six hundred and eighty feet, or thereabouts, thereof being upon land owned or controlled by the first party, and two hundred feet, or thereabouts, upon land owned or controlled by the sec- ond party. The first party hereby represents that they have lawful authority to permit the second party to con-

struct and use said side track, according to said plan and the terms of this agreement, beyond the line indicated on said plan as the limit to the second party's premises; and the first party hereby grants to the second party the right to construct and use said side tracks in accordance with the terms hereof, and hereby agrees to indemnify and save the second party harmless of and from all damages, costs, and expenses that may be suffered or incurred by it on account of any claim of trespass or other claim by any third party or parties arising from the construction or use of said side track.

"2. The material for the construction of said side track shall be furnished as follows: By the second party. The said side tracks, including ties, rails, switches, and crossing material, if any, shall be and remain the property of the second party, and under its exclusive control, except as herein otherwise stated. And the second party shall have the right to use the whole or any party of said tracks for other business than that of the first party, when it will not interfere with the first party's business, without any allowance therefor to the first party, and without restriction except as herein stated.

"3. The principal inducement for the construction of said side tracks by the second party is to secure as much as possible of the freight to be shipped to or from the first party in connection with the business carried on by the first party along or near said proposed side tracks, and, in consideration of the agreements of the second party herein contained, the first party hereby agrees that, from the date hereof, all freight shipped by the first party in connection with said business (and all freight shipped to them, so far as they control the shipment thereof) shall be shipped over the railroad of the second party, whenever it, either alone or in connection with other lines, shall be willing to carry the same at rates equally favorable with those actually offered by another carrier. And the first party shall, at all times during the continuance of this agreement, give the second party opportunity to meet the rates of a competitor before shipping any such freight by another carrier. The first party further agrees that all freight, the destination or place of shipment of which shall be off the lines operated by the second party, shall, so far as the first party may be able to control the same, be so routed as to give the second party the benefit of the longest possible haul over lines owned or operated by the second party. It

is agreed that, if at any time the first party shall fail to observe the true intent and meaning of this paragraph, the second party shall have the right, after fifteen days' notice to the first party, to terminate this agreement, and to enter upon the lands referred to, and remove said side track and all its connections.

"4. The first party recognizes that the use of said side track involves risk of loss by fire originating from the second party's engines. As a further inducement and consideration for the construction of said side track, the first party hereby assumes all such risk of fire, and releases the second party from all liability, statutory or otherwise, for any loss or injury by fire sustained in respect to buildings owned by the first party, or personal property belonging to or in charge of the first party, now situated or hereafter placed in the vicinity of said side track, whether such loss or injury be due to negligence of the second party or its employés, or to other causes; and the first party further agrees to keep the grounds adjacent to said side track, on each side, reasonably free and clear of inflammable and combustible material, so as to prevent the starting of fire, by means thereof, to the property of the second party and others, as well as to the property of the first party; and the first party hereby assumes all duty concerning the condition of said grounds, and releases the second party from all liability, statutory or otherwise, on account of fires that may be due, in whole or in part, to the condition of said grounds. The first party further agrees that, before or at the time of procuring fire insurance on any of their buildings or personal property now or hereafter situated in the vicinity of said side track, they will distinctly give notice to each and every insurance company about to issue a policy to the first party on such buildings or personal property, of the substance and purport of this agreement, so that each interested insurance company shall know that it will acquire no right, by subrogation or otherwise, to recover of the second party for any loss by fire; and the first party agrees to indemnify the second party from all damage, costs, and expenses on account of claims that may be made against the second party by any insurance company on account of the burning of any buildings or personal property located in the vicinity of said side track.

"5. The first party agrees that they will not erect, or permit to be erected, any structure, temporary or other-

wise, over or above said track, at a lower level than twenty-two feet above the track rails, nor nearer to the sides of the rails than six feet, without first obtaining the written consent of the second party; and, as a further inducement and consideration for the construction of said side tracks, the first party assumes all risk of injury to any building or structure, and the contents thereof, now or hereafter situated in the vicinity of said side tracks, caused by an engine or car coming in contact with said building or structure, whether due to negligence of the second party's employés or to other causes; and the second party is hereby released from all liability therefor.

"6. Said side tracks shall be maintained by the second party, and the cost of such maintenance shall be borne by the second party.

"7. In case the first party shall fail in the performance of any of the agreements on their part herein contained, the second party shall have the right, at once and without notice, to terminate this agreement; and it may at its option, after sixty days' notice in writing to the first party, elect to terminate this agreement. In either case it shall have the right to enter upon the property of the first party and remove said track and connections; but the second party, its successors and assigns, shall have the right to maintain and use said track, pursuant to this agreement, so long as the business reached thereby shall be conducted in the vicinity thereof; and the first party shall not grant or attempt to grant to any party any right to use the same at any time.

"8. The successors and assigns of the second party shall succeed to all the rights and privileges accorded by this agreement to the second party, and shall be entitled to enforce the agreements of the first party herein contained; and any assignment by the first party of his rights under this agreement shall be subject to the written consent of the general manager of the second party, and be void unless given with such consent."

The location of the mill, tracks, etc., will better appear from the sketch found on the following page.

The side track west of the mill, constructed under the above contract, commenced at the South Horn track, at point A, and terminated at point B, and is called B21. The east side track commenced at "Sta. 33," and ter-

minated at point C, and is called B18. The place marked with a star is where the fire originated. The places

marked X indicate the location of the lumber piles which were burned. The west siding can only be used by running cars northerly along the South Horn track to point

A, and there switching and taking them onto siding B21. The track east of the mill can only be used in connection with the Brewery track, which connects with the South Horn track. Therefore, in order to use either of these side tracks, the South Horn track or the Brewery track must be used as a part of the same operation.

The movements of the engine at the time were as follows: It went frem the South Horn track onto B21, hitched onto cars standing on that track, pulled them out onto the South Horn track, and then shoved those cars south on the South Horn track to a distance south of the switch connecting the South Horn track with the Brewery track. Then the engine moved back north to said switch, and passed in onto the Brewery track, and hitched onto seven or eight cars standing on said track east of the mill, which track was entirely filled with cars. The engine then pulled those cars south until it passed out onto the South Horn track. As it passed out onto the South Horn track, a fire was discovered 30 or 40 feet west of the South Horn track. From the South Horn track to the lumber piles the ground was covered with sawdust and shavings. They were very dry, and a very strong wind was blowing from a southerly direction directly towards the lumber piles. The fire was discovered in a few minutes, and some of the plaintiffs' employés were sent with pails of water in the attempt to put it out. It was, however, impossible. The wind carried the lighted shavings, and the fire soon covered the space—about 400 feet—between where it originated and the lumber piles, set the piles on fire, and they were entirely consumed.

In reply to special questions, the jury found that the engine was not in good condition when it left the defendant's shops, April 2d, 20 days before the fire; that it was not properly inspected at weekly intervals; that at each inspection after April 2d, and before the fire, it was not found to be in good condition. The jury also found that the engine was properly managed while engaged in the work upon the plaintiffs' premises.

The further statement of facts, so far as essential, will be made in connection with the points determined.

*Frederick W. Stevens* (*Benton Hanchett*, of counsel), for appellant.

*William Carpenter* (*Robert E. Bunker*, of counsel), for appellees.

GRANT, J. (*after stating the facts*). 1. Counsel for plaintiffs contend in their supplemental brief that the contract is void because it exempts a common carrier from loss resulting from its own negligence, and that such contracts are void as against public policy. This case does not fall within those where contracts to exempt from liability are held void on the ground of public policy. It is a fundamental rule of law that what one may refuse to do entirely he may agree to do upon such terms as he pleases. In contracting to put in these side tracks, the defendant was not acting in the capacity of a common carrier. It was under no legal obligation to put them in. It might have refused. It is a fact known to all, and appears upon this record as well, that engines, when properly equipped and properly managed, will oftentimes set fires, and the court so said to the jury. In *Burud* v. *Railway Co.*, 62 Minn. 243 (64 N. W. 562), the court say that a court, as well as a jury, is justified in taking notice of the fact that it is impossible, by means of any present known appliances, to so construct and equip a locomotive that it will not sometimes scatter sparks and cinders. There was no occasion to contract against properly equipped and properly managed engines, for fire caused by such would not create any liability. The only purpose of such a contract was to avoid the consequences of its own negligence, and to avoid lawsuits growing out of alleged negligent acts. It had a perfect right, both in reason and authority, to contract against such liability. This is well settled both by our own decisions and those of other jurisdictions. *Coup* v. *Railway Co.*, 56 Mich. 111 (22 N. W.

215, 56 Am. Rep. 374); *Michigan Southern, etc., R. Co.*
v. *McDonough*, 21 Mich. 165, 193 (4 Am. Rep. 466). In
the latter case, speaking through Justice CHRISTIANCY,
the court said:

"Having the right to refuse altogether, they must have
the right to refuse except upon just such terms and
conditions as they saw fit to require."

See, also, *Lake Shore, etc., R. Co.* v. *Perkins*, 25
Mich. 329 (12 Am. Rep. 275.

Many authorities upon this point are cited in the defend-
ant's briefs, among which are *Stephens* v. *Railway Co.*,
109 Cal. 86 (41 Pac. 783, 29 L. R. A. 751, 50 Am. St. Rep.
17); *Hartford Fire-Ins. Co.* v. *Railway Co.*, 175 U. S.
91 (20 Sup. Ct. 33); *Baltimore, etc., R. Co.* v. *Voigt*, 176
U. S. 498 (20 Sup. Ct. 385); *Quimby* v. *Railway Co.*,
150 Mass. 365 (23 N. E. 205, 5 L. R. A. 846). The late
case of *Russell* v. *Railway Co.*, 157 Ind. 305, 316 (61
N. E. 678, 55 L. R. A. 253, 87 Am. St. Rep. 214), is
directly in point.

The court read to the jury that provision of the contract
exempting it from loss by fire, and then said to them that
it was for them to determine whether the loss came within
the contract. The vice in this instruction lay in the fact
that it did not instruct the jury that the contract re-
lieved the defendant from its negligent acts. It was
clearly the duty of the court to so instruct the jury. The
court's instruction upon this point was as follows:

" It will be for you to say as to whether, taking every-
thing into consideration,—the entire surroundings, the
entire evidence in the case,—it was the contemplation of
the parties, according to this contract, that the plaintiffs
in this case were to assume and bear the burden of any
loss that might result because of the increased danger to
the defendant by putting in and operating these two new
side tracks; and if this loss, as I say, was caused by rea-
son of the proper operation and necessary management of
cars on those two tracks, or either of them, why, the
plaintiffs haven't any right to complain in this case; and
in that case, if you so find, and find that is established by

the evidence in this case, by a fair preponderance of it, the plaintiffs cannot recover."

The plaintiffs did assume the increased danger, and the exemption from liability agreed upon was not limited to losses caused by the "proper operation and necessary management of its cars." There was no ambiguity in the contract, and its construction belonged to the court.

2. The court also erred in leaving to the jury the question of whether the destroyed property was situated in the vicinity of the side tracks. The contract is explicit upon this point. It releases the defendant from all liability for loss by fire of any property "situated or hereafter placed in the vicinity of said side track, whether such loss result from negligence or other causes." It needs no authority to sustain the proposition that this property was situated in the vicinity of the track. The fire was started at a point about 40 feet from the track. Sawdust, shavings, and dry pieces of boards were situated upon the property at this point, and between that and the lumber piles, 400 feet distant. The lumber piles were situated very near the track, at a point farther north. The plaintiffs assumed the duty to keep their grounds in safe condition, and released defendant from all liability on account of fires that were due in whole or in part to the condition of the grounds. This property was situated on these grounds. The contract clearly recognized that the entire premises of the plaintiffs were adjacent to and in the vicinity of these tracks. Did they intend to leave it to a jury to say that property 30, 40, or 500 feet from these tracks, and situated upon the premises, was not upon land adjacent to and in the vicinity of the tracks? Such a contention, in my opinion, finds no basis either in reason or authority. Construing these expressions according to their common and approved use, the entire territory covered by this fire was in the vicinity of these tracks. See *Timmerman* v. *Dever*, 52 Mich. 34 (17 N. W. 230, 50 Am. Rep. 240). In *People* v. *White-Lead Works*, 82 Mich. 471 (46 N. W.

735, 9 L. R. A. 722), the term "vicinity," used in the opinion, was clearly intended to include all such persons as were near enough to be affected injuriously by the business sought to be prohibited. See, also, *Langley* v. *Barnstead*, 63 N. H. 246; *State* v. *Jungling*, 116 Mo. 162 (22 S. W. 688); *Coyle* v. *Railroad Co.*, 27 Mo. App. 584. The combustible character of the materials which the plaintiffs put upon these premises in close proximity to the track, and the danger in any high wind and dry time to the property if a fire should occur, were known to both parties, and it was in relation to these and other circumstances that they used the term "vicinity."

3. By the contract, plaintiffs assumed the duty and agreed to keep the adjacent grounds on each side of the tracks "reasonably free and clear of inflammable and combustible material, so as to prevent the starting of fire, by means thereof, to the property of the second party and others, as well as to the property of the first party." The plaintiffs, in fact, did nothing to comply with this provision of the contract. Their conduct was the same as if no contract existed, and there was no danger of fire. The most inflammable material was left close alongside the tracks, and when, from whatever source, the fire caught, it was in a few moments beyond control. Plaintiffs knew that this material was very dry, that there was a very high wind, and that from even well-equipped and well-managed engines sparks do escape. This material, to a depth of nearly a foot, had been lying at the place where the fire caught for nearly a year, and between that and the lumber piles they had meanwhile been drawing and dumping the same kind of inflammable material,—shavings, sawdust, and small pieces of boards. Did this contract mean that it was to be complied with by distributing this most inflammable material close to the defendant's tracks, without any covering or other means of protection? If it did, then this clause of the contract is meaningless, and imposed no duty upon the plaintiffs. So inflammable was the material that, in the high wind then prevailing,

plaintiffs' witnesses described it as "jumping right ahead. Something would fly in the air all on fire. It would take it up and carry it 20 or 30 feet at a time,— faster than we could follow it up. It catched from one place to another."

Did plaintiffs contract to do nothing more than to place this material there and leave it? At a very small expense it could have been covered with sand or dirt or cinders for a sufficient distance alongside the track to prevent fires. Or, as we know is often done, barrels of water could have been kept in such dangerous places near the track, ready for instant use. Or, knowing the increased danger on account of the wind, and the extreme dryness of the combustible material, a man could have been employed to watch during the short time used in switching. According to the plaintiffs' own witnesses, they knew that fire escaped from this engine several days before, and had set fires alongside the track; they knew that the wind, as one of the witnesses said, "was blowing a gale;" and yet they ordered the defendant to enter upon the premises to do the work under the contract. It seems to me too clear for further argument that plaintiffs did not comply with the contract, and that they failed to do the very things which the contract contemplated they should do, and which, if done, would have avoided the loss. It is no reply to the obligation of the plaintiffs under this contract to say that it is customary for mills like that of the plaintiffs to scatter this combustible material about their yards. Let this be granted, and it follows that this is the very condition against which the parties contracted, and imposed upon the plaintiffs the duty to obviate the danger and to assume the risk. If this mill had been the property of the defendant, and the land where the lumber was piled that of plaintiffs, and the fire had caught in this material upon the defendant's land, and spread to the lumber piles on the adjoining land, the railroad company could not have defended upon the ground that they used an approved engine and managed it properly. It would have been negligence to leave such inflammable material in close

proximity to passing trains, which are apt, especially in cases of high winds, to set fires. Yet plaintiffs ask the court to hold that they were complying with this contract by dumping this material where they knew that fires are apt to occur, and they took not even the slightest precautions to prevent it. It is too clear to require argument that a very small expense would have prevented the fire.

4. It is also urged that exemption from liability is, under the contract, limited to the two side tracks which the defendant agreed to, and did, construct. The side tracks were contracted for with the knowledge that they would be useless unless they were used in connection with the South Horn track and the Brewery track. The greatest danger from fire was along the west side of the South Horn track. There plaintiffs deposited their most inflammable material. It was under the instruction of the plaintiffs that the defendant's engine entered the premises, and it was taken there solely to do their work. It was while it was engaged in this work that the fire occurred. The engine would not have been upon plaintiffs' premises but for these side tracks. Plaintiffs' foreman gave the instruction; jumped onto the engine at the southerly end of the mill on the South Horn track; rode down past the switch, and up the Brewery track, and onto the east side track, where he jumped down and entered the mill. Under the plaintiffs' contention, the defendant would be liable if the fire escaped a moment before it entered the side track B21, or if it escaped when within an inch of the switch, but the moment that it passed beyond the switch, or outside the South Horn track, the exemption would apply. This side track and the South Horn track are very near to each other for the whole distance of the side track. Is it reasonable to suppose that the defendant, in putting in this side track, agreed that it would be exempt only for a less and comparatively slight danger, and should be liable for the greater danger? We think the fair construction of this contract is that the defendant was to be exempt from liability while entering upon the South Horn track

or upon the Brewery track in connection with, and for the express purpose of using, these side tracks in the business of, and solely for the use of, the plaintiffs, and under their direction.

5. As already stated, plaintiffs' foreman had knowledge of the fact that this engine threw sparks; yet he made no complaint, and instructed defendants' employés to bring this engine upon plaintiffs' property for use when there was the greatest liability to fire.   Plaintiffs' foreman, who represented them, testified: After · jumping onto the engine,—

" I spoke to the engineer about being careful about working his engine.   I told him we had had a fire the day preceding, and the Saturday before that, right after his engine went by, and I told him—the wind was blowing very hard, and it was very dry—I would like to have him be careful working his engine in going by the corner.   He gladly told me he would do so."

It thus conclusively appears that plaintiffs, according to their own testimony, knew that this engine threw sparks; that it was apt to set fire; that they not only made no objection or protest, but, with full knowledge of the facts, not only invited, but directed, the defendant to bring it upon the premises to do their work, and at a time when the danger was greatly increased by the wind blowing, as this witness said, "a gale."   The engine was properly managed, as the jury have found, and was therefore managed as plaintiffs, through their foreman, requested it should be.   These facts bring the case within the rule of *Marquette, etc., R. Co.* v. *Spear*, 44 Mich. 169 (6 N. W. 202, 38 Am. Rep. 242); *Spear* v. *Railroad Co.*, 49 Mich. 246 (13 N. W. 610).   In that case the same defect was claimed as in this, with the same result following, namely, throwing sparks which caused fires.   In that case Mr. Spear called the attention of the proper railway officials to this fact, and they promised to fix it, but "put off the fixing."   In the opinion the court say:

" It seems almost unnecessary to do more than to recite

this evidence in order to dispose of the case. Instead of showing a cause of action, it effectually disproves the existence of one. This was not the case of a defective locomotive moving through the country, and scattering desolation among those to whom its proprietors owed the duty of a care corresponding to its dangerous nature, but it was a case of private employment, whereby the proprietors of the engine were solicited to send it upon the private business of the employers into a place where the latter well knew, and had for a long time known and understood, it was likely to do mischief."

Instead of instructing the jury in accordance with that case, the court instructed them as follows:

"If the conditions at the time indicated that to switch the cars on Mann, Watson & Co.'s premises would be attended with unusual risk of setting fire, it was negligence on the part of the railroad company to do the switching at that time."

It was not the fault of the defendant that its engine was there. It was not the duty of the defendant to refuse the use of its engine when requested. By the terms of the contract, it was bound to furnish it. Presumably, the plaintiffs knew the condition of the ground better than did the defendant's employés. They knew the danger, and, if they did not desire to have the work done then, it was their duty either to keep the engine away, or protect the premises from the dangers incident to its use, and covered by their contract. If either was negligent for the switching under these conditions, it was the plaintiffs, not the defendant.

Under the above disposition of the case, it is unnecessary to determine whether there was evidence of negligence to submit to the jury.

Judgment reversed, and no new trial ordered.

MOORE, CARPENTER, and MONTGOMERY, JJ., concurred. HOOKER, C. J., took no part in the decision.