Seymour et al., Appellants, v. New Bremen Speedway, Inc., et al., Appellees.

[Cite as Seymour v. New Bremen Speedway (1971), 31 Ohio App. 2d 141.]

(No. 245—Decided August 20, 1971.)

*Messrs. Bowers, White & Demeo,* for appellants.
*Messrs. Curtner, Selva, Parkin & Seller,* for appellees.

Cole, J. Although the plaintiffs, appellants herein, assign numerous errors, most of them are directed at findings made by the court as a predicate for granting the motion made by defendants, appellees herein, at the close of plaintiffs' evidence for a directed verdict. As we here consider these assignments of error, 1, 2, 3, 4, 6, 8, 9 and 10 are directed to the basic issue as to the correctness of the trial court's decision in granting this motion. The other two issues or assignments of error are directed to the refusal of the trial court to grant plaintiffs' leave to amend their petition in certain particulars. We shall deal first with the fundamental issue: the direction of a verdict for defendant by the trial court. As the plaintiffs state, it is only when reasonable minds could come to but one conclusion that the issue becomes one for the court. The

issue is whether or not reasonable minds could differ as to the facts herein involved, pertinent to the applicable law.

Plaintiff Richard Seymour was a racing driver of long experience. He knew the risks inherent in auto racing: the risk of collision, the risk of spinning, even the risk of fire. He clearly testified to these customary risks; even to the fact his clothes were fireproofed to minimize the danger of fire. The testimony of the others from his race track crew leaves no doubt that he knew of these risks.

"Where the injured party knowingly and deliberately assumed the risk that led him into immediate danger, he ought not to have a remedy for injuries brought on by his own act, and arising from perils that were so obvious and certain."

39 Ohio Jurisprudence 2d 615, Negligence, Section 80; *Krause* v. *Morgan* (1895), 53 Ohio St. 26.

As applied specifically to racing, we have the case of *Roeckner* v. *Pence Drag Strip, Inc.* (1965), 10 Ohio App. 2d 20, where paragraph 1 of the syllabus states:

"A person is not chargeable with assumption of risk unless he knows about the danger or risk, appreciates the possible consequences, and consents to assume it."

In short, knowledge of the risk is essential, and here plaintiff Richard Seymour knew of the risks of collision, of hitting the surrounding fence or wall, of spinning, and of the possibility of fire. Whether he signed a release or not, he assumed the risk of these inherent dangers by simply entering the race.

There is some testimony by one witness as to an oil slick upon the surface of the track. However, this witness also indicates that this was not present prior to the race involved. It must therefore have developed during the course of the race itself and constituted a development over which the defendant had no control and one of the risks assumed.

We would conclude that when Richard Seymour's auto collided with the wall and spun, this was a risk assumed by him. When a car behind collided with his, this was a normal and anticipated risk of which he knew and

which he assumed. When the gas tank burst and fire resulted, this was a risk, one greatly feared, which he had assumed by taking part in the race.

Therefore, up to the moment his auto came to a halt with him in it in a dazed condition and the fire underway, there was nothing to constitute negligence of the defendants, and all risks to that moment had been assumed by him.

The plaintiffs, in their brief, essentially admit that Richard Seymour assumed the risk of fire upon his person. They argue, however, that the defendants had no firefighting apparatus or personnel posted and that this neglect led to his injury. However, the question is raised as to when this negligence, if it existed, became operative so as to be the proximate cause of the injuries alleged.

The driver was within seconds pulled from his vehicle by another driver who stopped his car somewhat ahead of him and ran back. It is clear from the testimony that there was no general knowledge at this time that the car or the driver was burning. Such cars use alcohol as fuel which burns without a visible flame and may be recognized only by the heat waves and occasional plumes of smoke from other burning substances. Here the first person to recognize this condition was the driver who pulled the plaintiff driver from his car, although some witnesses state that they had seen heat waves from the car about this same time or shortly prior thereto. The assisting driver threw the injured plaintiff to the ground and rolled over him to smother the flames.

This apparently served then as a signal to the stands and to the race personnel that fire was involved. Plaintiff Diane Seymour testified that the moment the spin was apparent she saw the track ambulance start to move, thus indicating some action by defendant to aid the plaintiff driver.

Thus, up to this point, whether the defendant had had fire extinguishers at the track corners and more personnel there or not, the sequence of events would have been the same, and these events would be included within

the orbit of the assumed risk. It would also take a certain amount of time to go from the corner station to the point of the accident. Therefore, any negligence could not become operative so as to be the proximate cause of injury until this added time expired.

However, at this moment, it is clear from the evidence that the vast bulk of the damage had been done, and the vast bulk of the burning of Richard Seymour's legs and face had already occurred. Before any track assistance could have been reasonably effective, the second driver had already removed Seymour from his car and substantially extinguished the flames.

There is, however, evidence that the uniform was still smoldering and was cut and torn off of Seymour by others. The theory of the plaintiffs is that this smoldering uniform contributed to Seymour's injury, which would not have occurred if the defendants had had adequate fire extinguishers and personnel to then extinguish the smoldering cloth.

This is not a case of concurring causes, since any alleged negligence of the defendants could not have become operative until this moment when most of the damage had occurred as a result of causes the risk of which had been assumed by the injured plaintiff. There is essentially a contention that a preexisting injury, i. e. that received by virtue of the assumption of risk, was aggravated by the negligence of the defendant at this moment. But there is no evidence to indicate which portion of the damage occurred after the defendants' alleged negligence and could conceivably act as a proximate cause. We know from Palker's testimony that Seymour's legs were on fire at the time he was taken from the car, and at this point there could have been no proximate cause of injury or of a failure to assist. The accident had only happened seconds before. Then, Palker placed him on the ground and rolled on him and believed he had the fire extinguished as far as the flames were concerned. In Exhibit 12 there is obviously charred cloth on Seymour's legs, and Palker's bare hand is on the back of one lower leg. At this moment, we would

find from the uncontroverted testimony that Seymour's legs had been severely burned—a risk he had assumed and one not due to any negligence of defendants.

The testimony then shows Seymour was moved by another driver, also in the immediate vicinity, to a position near the inner rail. Then others arrived and efforts were made to remove the smoldering uniform. Only after Palker had ceased his efforts to put out the fire would any failure of the defendants to have personnel or equipment handy become operative in such a manner as to become the proximate cause of further injury.

But there was no evidence as to what further injury occurred. To permit the jury to determine that a portion of these injuries were attributable to negligence of the defendants on the record here presented would have invited pure speculation. Obviously, the defendants were not liable for the full damages since a major portion of the burning took place prior to any possible operation of their alleged negligence. If the aggravation of the injury is the basis for the claim, there is no evidence on which the degree of aggravation may be determined. The jury would simply have to guess, for no factual basis was introduced on which to predicate such a finding.

The court below refused to permit the jury to so speculate and this we believe was correct.

A second ground, however, exists on which to predicate the direction of the verdict.

The plaintiff driver had signed a release on August 13, 1967, at a prior meeting of the operators of the racetrack, as follows:

"Whereas, the undersigned wishes to compete in Auto Racing Events sanctioned by the New Bremen Speedway, Inc., and

"Whereas, the undersigned knows the perilous nature of his undertaking as it relates to loss of life and/or limb, therefore it is agreed as follows:

"That in consideration of being allowed to compete in auto racing events for prize money and other valuable consideration to be offered by the New Bremen Speedway,

Inc., the undersigned hereby voluntarily assumes all risk of accident or damage to his person or property and hereby releases the New Bremen Speedway, Inc., and its promoters from every claim, liability or demand of any kind for or on account of any personal injury or damage of any kind sustained, whether caused by the negligence *of* the said New Bremen Speedway, Inc., and its promoters or otherwise."

He admits signing this release on August 13, 1967. By its terms, this release is not limited to the date in question. The consideration is "being allowed to compete in auto racing events for prize money and other valuable consideration to be offered by the New Bremen Speedway, Inc." This does not contain any time limit but applies to any competition at that track for prize money so offered.

The injured plaintiff was driving in a race for which prize money was offered and which his car team ultimately won and collected $20. Since many new drivers undoubtedly would appear at each meet, it is conceivable the track took new releases each time to insure that each person in the pit area had so signed, but there is no testimony pit passes were collected or voided at the end of each meet or that they were dated. They continued and so did the releases covering all meets at which the driver or other party competed for prize money.

The August 13th release was therefore fully effective as to events of September 10th, 1967.

Such a release has been held effective and not against public policy in Ohio. Essentially, the same release form was involved in *French* v. *Special Services, Inc.* (1958), 107 Ohio App. 435, where the syllabus states:

"1. A participant in a stock car race and the proprietor thereof are free to contract in such a manner as to relieve the latter from the responsibility for damages or injuries to the former caused by the latter's negligence, excepting when caused by willful or wanton misconduct.

"2. An agreement between a participant in and the proprietor of a stock car race, whereby the former assumes the risk of injuries resulting from his participation in such event and releases the proprietor from any

claims for damages, is not invalid as against public policy.

"3. The consideration expressed in such release agreement—the 'being allowed to compete in auto racing events' for which prizes are awarded—is a valuable consideration; and such release is not, therefore, invalid for want of consideration."

See also *Hine* v. *Dayton Speedway Corp.* (1969), 20 Ohio App. 2d 185.

No release was involved in *Roeckner* v. *Pence Drag Strip, Inc., supra,* and, hence, that decision was based solely on the common law assumption of risk principle and limitations therein as to knowledge of the risk. The release here involved was for any injury caused by negligence or otherwise, a much broader concept.

We hold the release, signed prior to the race in question, governed all subsequent races in which the signer entered to compete for prizes by auto racing; that it therefore was applicable to the race in which the plaintiff driver was injured; that it was a valid release, and not against public policy; that it was for a valuable consideration, and that it constitutes a full defense to any claim for damages against defendants except those due to wanton or willful negligence.

Further, the plaintiff driver was on the track the day of the accident. The evidence was clear that no one was permitted to race without a pit pass. Therefore:

(a) If he entered by virtue of a pit pass from the previous occasion, the terms of the release applied;

(b) If he entered by virtue of a pit pass obtained for this race by another, as some evidence indicated, he, by using it, ratified the signature placed on the release by that other person and was bound thereby; or

(c) If he entered with no pass at all, he was a trespasser. To a trespasser, the defendant would owe only the duty to refrain from willful or wanton wrong doing—the same duty as would exist under the release. *Soles* v. *Ohio Edison Co.* (1945), 144 Ohio St. 373. And there is no claim of active negligence, only of a passive failure to have sufficient safety appliances or personnel.

Plaintiffs sought to amend their petition at the close

of their case to state that the defendants' acts were willful and wanton. Willful misconduct is essentially intentional misconduct, and there is no evidence to show any such intent. Wanton misconduct was considered by the Supreme Court in *Roszman* v. *Sammett* (1971), 26 Ohio St. 2d 94, where paragraph 2 of the syllabus reads:

"To constitute wanton misconduct justifying recovery, the conduct of the tort-feasor must be more than negligent: it must be such conduct with knowledge of a dangerous situation liable to cause injury to others, as manifests a heedless disregard for or indifference to the rights of others or for the consequences, *i. e.*, such conduct as manifests a disposition to perversity."

A full review of the evidence here fails to reveal any neglect of the degree that would show a disposition to perversity. There was a fire truck of sorts, an ambulance, at least some men in uniform and some volunteer flagmen. There was nothing to show a heedless disregard for the rights of others. The motion was properly denied. See also *Hine* v. *Dayton Speedway, supra.*

In the light of the foregoing, it was also not error to refuse plaintiffs' motion for leave to amend by inserting the words "that the defendants were negligent in hiring unqualified personnel."

The trial court properly instructed the jury to return a verdict for the defendant.

*Judgment affirmed.*

GUERNSEY, P. J., and TROOP, J., concur.

TROOP, J., of the Tenth Appellate District, sitting by designation in the Third Appellate District.