TOPE v WATERFORD HILLS ROAD RACING CORPORATION

1. WORDS AND PHRASES—PUBLIC POLICY—DEFINITIONS.

"Public policy" evolves into constitutional provisions, statutes, and judicial decisions, and more often abides only in the customs and conventions of the people, in their clear consciousness and conviction of what is naturally and inherently just and right between man and man; where a course of conduct is cruel or shocking to the average man's conception of justice, it must be held to be obviously contrary to public policy.

2. CONTRACTS—INDEMNIFICATION AGAINST LIABILITY—NEGLIGENCE— PUBLIC POLICY.

An indemnity agreement entered into between a plaintiff race car driver and a defendant race promoter which unequivocally exempts the promoter from liability for damages sustained by the plaintiff because of the promoter's own negligence is not offensive to public policy where the general public as a whole is minimally affected by the agreement, private interests are primarily at stake, and the public interest would not be served by striking down the provision.

3. TORTS—NEGLIGENCE—CONTRACTS—INDEMNIFICATION AGAINST LIA- BILITY.

Generally, a party may contract against liability for harm caused by his negligence in performance of a contractual duty, but he may not do so with respect to his gross negligence; if the performance of a tortious act for which indemnification is claimed under the contract is only an undesired possibility in the performance of the contract, and the contract does not tend to induce the act, the indemnification provision is valid.

4. CONTRACTS—INDEMNIFICATION—PARTIES—BARGAINING POSITIONS— KNOWLEDGE.

A professional race car driver who entered into an indemnifica-

REFERENCES FOR POINTS IN HEADNOTES
[1] 16 Am Jur 2d, Constitutional Law § 167.
[2, 3] 47 Am Jur 2d, Contracts §§ 188–191.
    41 Am Jur 2d, Indemnity §§ 6–18, 29–31.
[4] 41 Am Jur 2d, Indemnity § 17.
    4 Am Jur 2d, Amusements and Exhibitions §§ 81, 98.

tion agreement with a race promoter should be held to a higher standard of conduct and knowledge than an amateur driver as regards the respective bargaining positions of the parties, particularly where the driver had previously participated in a race run over the same course, which consisted of city highways, and was aware of the increased hazards of racing on such a course.

Appeal from Wayne, William Leo Cahalan, J. Submitted November 3, 1977, at Detroit. (Docket No. 30719.) Decided March 6, 1978.

Complaint by Donald Tope, administrator of the estate of Harry W. Tope, deceased, against the Waterford Hills Road Racing Corporation for damages for negligence in the design and layout of a race course and in the management of an automobile race in which Harry W. Tope was fatally injured. Accelerated judgment for defendant. Plaintiff appeals. Affirmed.

*Goodman, Eden, Millender & Bedrosian* (by *James A. Tuck* and *Joan Lovell)*, for plaintiff.

*Harvey, Kruse & Westen, P. C.* (by *John A. Kruse* and *Michael F. Schmidt)*, for defendant.

Before: BEASLEY, P. J., and D. E. HOLBROOK, JR. and M. J. KELLY, JJ.

M. J. KELLY, J. Plaintiff appeals from an order for accelerated judgment of no cause of action granted the defendant on October 15, 1976, in Wayne County Circuit Court. Plaintiff is the administrator of the estate of Harry Warren Tope, a professional race car driver. Tope sustained fatal injuries during the Wide Track II road race held on July 5, 1975, at Pontiac, Michigan. The race was sponsored by the City of Pontiac and the

defendant, Waterford Hills Road Commission, Inc., a nonprofit Michigan corporation.

Tope had won the inaugural wide track race the year before his fatal accident. He had entered the 1975 race to promote his business, Tope Racing Enterprises, which was his source of livelihood. As a condition to participating in the race, all entrants paid $50 and signed an entry form containing an assumption of the risk, release, discharge of liability, and a separate form entitled "Waiver and Release from Liability and Indemnity Agreement".

Tope was killed when his race car collided with a guard rail during the race. The trial court noted:

"Tope's race car was a needle-nose design; the guardrail was of a single-beam design. When Tope's car collided with the guardrail, the single beam slid up the top of the car until it impacted with Tope's head."

Plaintiff administrator filed the instant action alleging that defendant's negligence in the design and layout of the race course and in the management of the race resulted in Tope's death. Defendant filed a motion for accelerated judgment based upon:

"(1) [A] purported contractual assumption of risk and release of Defendant contained in the entry blank signed by Tope prior to the race; (2) a purported contractual assumption of risk and release of Defendant contained in the Waiver and Release from Liability and Indemnity Agreement, signed by Tope and other drivers prior to the race; and (3) contributory negligence which Defendant claims Tope was guilty of as a matter of law." Trial court's opinion, p 1.

The motion was granted.

Plaintiff raises one issue on appeal contending that the contract provision which exempts an auto

racing club from liability for personal injuries to the auto racers caused by the club's negligence is unenforceable as being contrary to public policy.

The relevant contractual terms, pertaining to the assumption of risk provision and the release and waiver, provide:

"The entrant, in signing this agreement and in consideration of the right to use the race course at his own risk and thereby releases and discharges the Waterford Hills Road Racing, Inc. and The City of Pontiac, the organizers and race officials, together with their successors, assigns, officers, agents, employees, from all liability for injuries to person, property or reputation, suffered by him or his employees as a result of the race or races or events contemplated under this entry blank, or practice or preparation therefor, and whether caused by any condition of the road course or grounds or the conduct of any officer, agent, representative, or employee of the Waterford Hills Road Racing, Inc., or the City of Pontiac and the organizers and race officials, or conduct of said races. It is further agreed that the entrant, in signing this entry form has studied the rules and regulations in the entry form, and agrees to abide thereby. He further agrees to ensure that all crew members and driver designated to drive the car are similarly acquainted with the aforementioned rules." Official Entry Blank.

"IN CONSIDERATION of being permitted to enter for any purpose of the RESTRICTED AREA (herein defined as the area to which admission for the general public is prohibited, including but not limited to the pit area, racing surface and infield, including walkways, concessions and other appurtenances therein) each of the Undersigned, for himself and personal representatives, assigns, heirs and next of kin:

1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the Promoter, Racing Association, Track Operator, Track Owner, Landowner, and each of them, their officers, and employees, all for purposes herein referred to as RELEASEES, from all liability to the Undersigned, his personal rep-

resentatives, assigns, heirs and next of kin for all loss or damage, and any claim or demands therefor, on account of injury to the person or property or resulting in death of the Undersigned, whether caused by the negligence of Releasees or otherwise while the Undersigned is upon the Restricted Area, and

\* \* \*

"Each of the Undersigned warrants the following statements are true and correct and understands that the Releasees have relied on them in entering into the foregoing Release, Waiver and Indemnity Agreement and in giving the Undersigned permission to enter the Restricted Area:

"1. No oral representations, statements or inducements apart from the foregoing written agreement have been made.

"2. He assumes full responsibility and risk of bodily injury, death or property damage due to negligence of Releasees or otherwise upon entering the Restricted Area.

"3. If a driver, he has a valid driver's license from the state of his residence.

"4. That he is an independent contractor and assumes and takes all responsibility for all charges, premiums and taxes, if any, payable on any funds he may receive as a result of his activities, including without limiting the generality of the foregoing, social security, unemployment, income and withholding taxes, and Workmen's Compensation insurance.

"5. HE HAS READ AND VOLUNTARILY SIGNS THIS RELEASE AND WAIVER OF ALL LIABILITY OF INDEMNITY AGREEMENT." Waiver and Release from Liability and Indemnity Agreement (hereafter "Waiver and Release").

The waiver and release expressly exempts defendant from liability for damages to the plaintiff caused by defendant's negligence. Construing the indemnity clause strictly against defendant we find the language unequivocal in exempting defendant from liability for damages sustained by

the plaintiff because of defendant's own negligence. See *Klann v Hess Cartage Co,* 50 Mich App 703, 705–706; 214 NW2d 63 (1973). We are asked to determine whether or not the indemnity clause is contrary to public policy. The precise definition of "public policy" has recently been set forth by another panel of this Court quoting the language found in *Skutt v Grand Rapids,* 275 Mich 258, 263–265; 266 NW 344 (1936). *Murphy v Seed-Roberts Agency, Inc,* 79 Mich App 1, 13; 261 NW2d 198 (1977). A summary of the definition establishes that "public policy" evolves into constitutional provisions, statutes, and judicial decisions, " '[m]ore often * * * it abides only in the customs and conventions of the people,—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man' ". The definition is further qualified by the Court in the following passage:

" 'When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court.' "

There is no constitutional or statutory provision, or court decision which specifically declares the instant release clause, as it relates to auto racing, contrary to public policy. *Query:* Is it "cruel or shocking to the average man's conception of justice" for a race promoter to insulate itself from liability for its own negligence? We are dealing with a fairly narrow segment of the public participating in a relatively dangerous sporting activity. The general public as a whole is minimally affected.

We find the contract provisions are not inimical to the public interest. *Cf. Gray v Galesburg,* 71 Mich App 161, 166; 247 NW2d 338 (1976). Private interests are primarily at stake. See *Winterstein v Wilcom,* 16 Md App 130; 293 A2d 821, 826 (1972). The public interest would not be served by striking down a contract provision between private parties voluntarily assumed and historically sanctioned in Michigan in other factual situations. *Mann v Pere Marquette R Co,* 135 Mich 210; 97 NW 721 (1903), *Blazic v Ford Motor Co,* 15 Mich App 377, 380; 166 NW2d 636 (1968), *lv den,* 382 Mich 758 (1969), *Shelby Mutual Insurance Co v Grand Rapids,* 6 Mich App 95; 148 NW2d 260 (1967), *United States Fibres, Inc v Proctor & Schwartz, Inc,* 358 F Supp 449 (ED Mich, 1972).

In *Gore v Tri-County Raceway, Inc,* 407 F Supp 489, 492 (MD Ala, 1974), wherein a widow of a participant in an auto race brought suit against the operator of the race track for damages for her husband's death, the court, reviewing a similar release clause, stated:

"If these agreements, voluntarily entered into, were not upheld, the effect would be to increase the liability of those organizing or sponsoring such events to such an extent that no one would be willing to undertake to sponsor a sporting event. Clearly, *this would not be in the public interest."* (Emphasis added.)

The *Gore* court granted defendant's motion for summary judgment and dismissed plaintiff's case.

This Court has held:

"Generally a party may contract against liability for harm caused by his negligence in performance of a contractual duty, but he may not do so with respect to his gross negligence. *Shelby Mutual Insurance Co v*

*Grand Rapids,* 6 Mich App 95; 148 NW2d 260 (1967); *Thomas v Atlantic CLR Co,* 201 F2d 167 (CA 5, 1953), Restatement, Contracts, § 574; 6A Corbin on Contracts, § 1472, pp 596–597. * * *

"A contract of indemnity against one's own negligence is not necessarily invalid. *Buffa v General Motors Corp,* 131 F Supp 478 (ED Mich, 1955); *Blazic v Ford Motor Co,* 15 Mich App 377; 166 NW2d 636 (1968). If the performance of the tortious act for which indemnification is claimed under the contract is only an undesired possibility in the performance of the contract, and the contract does not tend to induce the act, the indemnification provision is valid. Restatement, Contracts, § 572." *Klann v Hess Cartage, supra,* at 706.

The fatal accident here caused in part by the negligent design of the guard rail for racing purposes, was "only an undesired possibility in the performance of the contract, and the contract [did] not tend to induce the act". Under *Klann* such a provision is valid.

The *Klann* panel noted some exceptions to the above rules, specifically, contracts of common carriers and other public servants when contracting in their capacity to serve the public. The instant facts do not present parties directly serving the public, thus, the exceptions are inapplicable.

Plaintiff relies upon *Allen v Michigan Bell Telephone Co,* 18 Mich App 632; 171 NW2d 689 (1969), *lv den,* 383 Mich 804 (1970). In *Allen,* this Court refused to enforce a contract clause which limited the telephone company's liability for damages when it failed to publish plaintiff's advertisements in the yellow pages as it had contracted to do. The primary concern of the Court in denying effect to the exculpatory clause was that the plaintiff was contracting with a public utility which, in essence, had a monopoly on the type of advertising sought by the plaintiff. There being no realistic alterna-

tive means for the plaintiff to communicate with the same audience which the yellow pages reaches, the Court found that the nonliability term was offered on a "take it or leave it" proposition, that the term was unreasonable and, in effect, unconscionable. The Court concluded by stating:

"We believe the law in Michigan to be that, where goods or services used *by a significant segment of the public* can be obtained from only one source, or from limited sources on no more favorable terms, an unreasonable term in a contract for such goods or services will not be enforced as a matter of public policy." (Emphasis added.) 18 Mich App at 640.

We hold the *Allen* decision inapplicable and plaintiff's reliance on it not justified under the facts of this case. The *Allen* Court was concerned with a public utility and monopolistic services offered to the general public at large. The facts of the instant case do not concern a public utility nor public services. There is no great disparity in bargaining power between the parties. Furthermore, we are not confronted with a situation where "a significant segment of the public" would contract with defendant.

Judicial opinions from other jurisdictions have upheld similar race track release forms. See *Corpus Christi Speedway, Inc v Morton,* 279 SW2d 903 (Tex Civ App, 1955), *French v Special Services Inc,* 107 Ohio App 435; 159 NE2d 785 (1958), *Gore v Tri-County Raceway, Inc, supra, Hine v Dayton Speedway Corp,* 20 Ohio App 2d 185; 252 NE2d 648 (1969), *LaFrenz v Lake County Fair Board,* — Ind App —; 360 NE2d 605 (1977), *Lee v Allied Sports Associates, Inc,* 349 Mass 544; 209 NE2d 329 (1965), *Morrow v Auto Championship Racing Assoc, Inc,* 8 Ill App 3d 682; 291 NE2d 30 (1972),

*Seymour v New Bremen Speedway, Inc,* 31 Ohio App 2d 141; 287 NE2d 111 (1971), *Solodar v Watkins Glen Grand Prix Corp,* 36 App Div 2d 552; 317 NYS2d 228 (1971), *Theroux v Kedenburg Racing Assoc, Inc,* 50 Misc 2d 97; 269 NYS2d 789 (1965), *Winterstein v Wilcom,* 6 Md App 130; 293 A2d 821 (1972). In fact, plaintiff fails to cite a single case where such a clause has been denied application. The *Winterstein* court held:

"The short of it is that as to the releases here the effect of the exemptive clauses upon the public interest was nil. We find that each release was merely an agreement between persons relating entirely to their private affairs. In the absence of a legislative declaration, we hold that they were not void as against public policy." 16 Md App at 139; 293 A2d at 826.

We agree with the quoted conclusion.

Plaintiff's brief notes that none of the cases cited by defendant involved a plaintiff who raced for a living as did Mr. Tope. This argument reverses itself to his detriment. Professional race car drivers should be held to a higher standard of conduct and knowledge reflecting a more equable bargaining position than the amateur.

Furthermore, the instant race in which plaintiff's driver had previously participated was run over city highways, an admittedly unique format. The race has since been discontinued by order of the State Highway Commission. It is indisputable that city highways are not best adapted to race car driving. The record indicates that Tope was aware of the increased hazards of racing on city streets.

The instant exculpatory clauses in the auto racing contract are not contrary to public policy and are enforceable. The order of the trial court granting defendant's motion for accelerated judgment of no cause of action in favor of the defendant and against the plaintiff is affirmed.