562 So.2d 195 (1990)
John W. REECE
v.
Richard A. FINCH, et al.
88-1400.
Supreme Court of Alabama.
February 23, 1990.
Rehearing Denied May 4, 1990.
*196 Dieter Schrader, Huntsville, for appellant.
Gary C. Huckaby and Stuart M. Maples, of Bradley, Arant, Rose & White, and Patrick M. Lamar of Lanier, Ford, Shaver & Payne, Huntsville, for appellees.
Wendell R. Morgan, Gen. Counsel, for amicus curiae The Medical Ass'n of the State of Alabama.
JONES, Justice.
This is an appeal by the plaintiff, John W. Reece, M.D., from a summary judgment for the defendants, Drs. Finch, Warren, Smith, Wheeler, and Cameron. Dr. Reece's complaint alleged negligence, defamation, intentional infliction of emotional distress, intentional interference with a business or contractual relationship, and deceptive trade practices, arising from statements made to Mutual Assurance Society of Alabama ("MASA") in connection with three separate applications for medical liability insurance made by Dr. Reece.
Because we hold that the alleged defamatory statements, which were made only to MASA's employee, as Dr. Reece's duly constituted agent for the limited purpose of searching for information, were not published, within the legal definition of "publication," we affirm the judgment as it relates to the claim for defamation. Because we hold that the release violates established public policy with respect to prospective intentional torts, we reverse the judgment as it relates to those claims.

The Facts
Dr. Reece practiced obstetrics and gynecology in Huntsville from 1964 to 1983. In 1983, he moved to Florida, where he practiced medicine until the middle of 1984. In 1984, Dr. Reece relocated in Huntsville and again established his practice of medicine, specializing in gynecology. To maintain privileges in any or all of Huntsville's three hospitals, Dr. Reece, as a gynecological surgeon, was required by the hospitals to retain $1,000,000 in medical malpractice liability insurance coverage. Dr. Reece applied for such liability coverage with MASA on three separate occasions soon after his return to Huntsville. It was MASA's routine procedure to investigate all applications through several methods, including a peer-review evaluation process. MASA, in the course of its investigation, randomly contacted area physicians for the purpose of obtaining information relating to the insurable risk of Dr. Reece. The information received from the defendants with regard to Dr. Reece's applications for insurance forms the basis of this controversy. During MASA's investigation of Dr. Reece's three applications for insurance, MASA solicited evaluations and received, in response, the following statements from the defendants, as evidenced by these internal memoranda summarizing those statements:

"MemorandumAugust 7, 1984:
"....
"Dr. Richard Finch(Chief of Staff at Huntsville Hospital)Dr. Finch advised me that we should not insure Dr. Reece, that he was a bad risk. He says that Dr. *197 Reece is very unstable and has some psychological problems and domestic problems. He notes that Dr. Reece had a couple of bad instances in the emergency room with his wife.
"Dr. Charlie Warren(Ob-Gyn in Huntsville)He advised me that we should definitely not insure Dr. Reece. He told me that Dr. Reece was a paranoid schizophrenic with a lot of difficult problems that were hard to handle. He also told me that Dr. Reece had a drinking problem and thought he was an alcoholic. Dr. Reece also has some very bad domestic problems, he nearly beat his wife at one of the functions with all the doctors. He has also been married two or three times and is very unstable. Dr. Warren told me that they would not revoke his hospital privileges at the time that he was in Huntsville because they were afraid of what he might do to them, but he did inform me that if Dr. Reece were to come back to Huntsville he would do everything he could to get his hospital privileges revoked."

_____

"MemorandumSeptember 11, 1985:
"Charles Warren, M.D.(Ob/Gyn in Huntsville)Dr. Warren advised me that we do not want to insure him. He says that he is a definite mental case and also acts like he is a paranoid schizophrenic. Dr. Warren says he has moved around a lot and feels there are some big problems with him. He says other physicians in the community do not want him. Dr. Warren says he is a big man who weighs about 275 pounds and he says that everyone in the community is afraid of him. He feels we should not insure him.
"Don Wheeler, M.D.(Ob/Gyn in Huntsville, AL)Dr. Wheeler says that Dr. Reece is a definite zero. He also feels that he has a personality disorder. He says that he could be doing some unnecessary surgery. He says he would not be a good risk. Says we should check into this deeper.
"Horton Smith, M.D.(Ob/Gyn in Huntsville, AL)Dr. Smith says that Dr. Reece has got a personality problem that he acts very paranoid and strange at times. He says that he might be doing some unnecessary surgery because the indications are bad. Dr. Smith says that he reviewed his charts for one year and the surgery that he had done looked really good. He says he seems to be competent surgically. He says that we should check into this deeper. He says he would not insure.
"Bill Cameron, M.D.(Ob/Gyn in Huntsville)Dr. Cameron advised me that he would not write him for coverage. He says he has severe emotional problems. He says he does reasonably good work. He says he does not have good patient rapport. He says he would definitely be a high risk. He says that everyone in the community is afraid of him. Would not insure."
The defendants based their joint motion for summary judgment on the ground that three documents entitled "Authorization to Release Information," one signed by Dr. Reece at the time of each of his three applications with MASA, absolved them of any and all liability related to their supplying information to MASA. The release reads, in part, as follows:
"The undersigned.... authorizes all medical associations and medical societies in which he is or has been a member, all hospitals in which he now holds or has held staff privileges, the State Board of Medical Examiners for the State of Alabama and any other State in which he has practiced, the State Department of Public Health for the State of Alabama and any other State in which he has practiced or resided, and any and all physicians having information regarding the undersigned, to release to the Society upon its request any information any such person or entity may have which in the judgment of any such person or entity or the Society may have a bearing upon his acceptability to the Society as a professional liability insurance risk.
"The undersigned hereby releases and agrees to hold harmless all persons or organizations releasing the information *198 described above, their agents, servants, and employees, and the Society, its directors, officers, employees, agents, and members from any liability arising out of the release or use of any information released or furnished pursuant to this authorization, notwithstanding the fact that there may be errors, omissions, or mistakes contained in such released information.
"The undersigned further agrees that the Society and all persons and organizations described above may rely upon a photostatic copy of this Authorization, which shall be of equal validity with the signed original."

The Issue
The ultimate issue on appeal is whether the general release and hold-harmless agreement contained in the "Authorization to Release Information," which is prospective in nature, absolves the defendants from any and all liability relating to the information disclosed, as a matter of law.[1] With respect to Dr. Reece's claim based on defamation, however, the propriety of the summary judgment against him depends for its resolution upon the underlying issue whether Dr. Reece has met the threshold burden of proving the requisite element of publication.
Dr. Reece contends that the release is void and of no effect insofar as intentional torts are concerned. He avers that the defendants sought to disparage his professionalism as retribution for his 1979 testimony against a Huntsville physician in a medical malpractice case. Dr. Reece construes the release as being specifically limited to "errors, omissions, or mistakes"; thus, he argues, the release can be valid only to the extent that it waived liability resulting from "negligent" acts of the defendants.
Conversely, the defendants argue that Dr. Reece's authorization to release information unequivocally released them from any liability connected with their evaluation of Dr. Reece.

The Defamation Claim
The legal effect of Dr. Reece's execution of the general release, coupled with his applications for insurance coverage, was to appoint MASA's employee as his agent for the limited purpose of seeking information from other physicians concerning such coverage. Not only did Dr. Reece contemplate contact between MASA's employee and other members of the medical profession, but he expressly authorized the solicitation of information from his fellow doctors pertinent to his application for malpractice insurance.
Our cases have held that statements made to one's agent, which are both authorized and invited by the principal, are not deemed to have been "published"; and without "publication" there can be no defamation. McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947); see also Dixon v. Economy Co., 477 So.2d 353 (Ala.1985); and Mims v. Metropolitan Life Ins. Co., 200 F.2d 800 (5th Cir.1952).
The rationale for this rule is this: Because the requisite element of publication is not met if the allegedly defamatory words (whether written or oral) are made only to the complaining party, such words are not published when made to one who stands in an agency relationship with the complaining party, if the agent represents the principal in the matter discussed and invited by the principal. Stated otherwise, statements made to an agent, under these circumstances, are the legal equivalent of statements made directly to the principal; thus, there is no publication, and without publication there can be no actionable claim for defamation.
The summary judgment is affirmed as to the claim alleging defamation.

The Claims Based on Other Alleged Intentional Torts
This Court in Barnes v. Birmingham International Raceway, Inc., 551 So.2d 929 (Ala.1989), has recently held a general *199 release that purported to discharge Birmingham International Raceway ("BIR") from any and all liability to be valid only as to claims based on negligence. In that case, the plaintiff (Barnes), before entering a stock car race, signed a document purporting to release BIR from any and all liability for injuries he might receive during the race. The plaintiff was injured in an accident during the race and subsequently sued BIR and others on claims alleging negligence and wantonness. The trial court, relying on the release, granted the defendants' motions for summary judgment. This Court affirmed the summary judgment as to the negligence claim but reversed as to the wantonness claim.
Justice Houston, writing for the Court, stated:
"Other than Young v. City of Gadsden, [482 So.2d 1158 (Ala.1985)], we have found no cases in the United States that uphold pre-race releases for wanton and willful conduct. Those jurisdictions that have addressed this issue hold that general pre-race releases exculpating one from liability for wanton or willful conduct are invalid and contrary to public policy. See Conradt v. Four Star Promotions, Inc., [45 Wash.App. 847, 728 P.2d 617 (1986) ], (an exception to validating contracts waiving liability exists where the conduct was substantially or appreciably substandard and fell greatly below the standard established by law for the protection of others against unreasonable risk of harm); Tope v. Waterford Hills Road Racing Corp., [81 Mich. App. 591, 265 N.W.2d 761 (1978) ], (generally a party may contract against liability for harm caused by negligence in the performance of a contractual duty, but he may not do so with respect to his gross negligence); Seymour v. New Bremen Speedway, Inc., [31 Ohio App.2d 141, 287 N.E.2d 111 (1971)], (the release was not against public policy and constituted a full defense to any claim for damages except those due to `wanton or willful negligence'); see also LaFrenz v. Lake County Fair Board, [172 Ind.App. 389, 360 N.E.2d 605 (1977) ], (exculpatory agreements are not valid as to extreme forms of negligence or any conduct that constitutes an intentional tort).
"In Alabama, willfulness or wantonness imports premeditation or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act, while negligence involves inadvertent action. See Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala. 1987).
"Having considered the decisions of other jurisdictions that have addressed the issue of the validity of release forms in the context of racetracks, and having reconsidered the nature of willful and wanton conduct, we are of the opinion that the holding in Young v. City of Gadsden, supra, that pre-race releases exculpate one from liability for wanton conduct, is in error. The opinion in Young v. City of Gadsden, supra, did not elaborate on the evidence with respect to the alleged wantonness of the defendants, even though the holding in that case clearly was that pre-race releases could exculpate one from liability for wanton conduct. It was on the basis of that holding that the trial court in this case granted summary judgment for the defendants on the plaintiff's wantonness count. The court is convinced that the ratio decidendi of that portion of Young v. City of Gadsden, supra, would not be consented to today by the conscience and feeling of justice of the majority of all those whose obedience is required by the rule of law on which that ratio decidendi was based. Laun, Stare Decisis, 25 Va.L.Rev. 12, 22 (1938).
"Therefore we will depart from the doctrine of stare decisis and overrule that portion of Young v. City of Gadsden, supra, that holds that pre-race releases exculpating a person from liability for wanton conduct are valid and not against public policy. We are persuaded, and now hold, that pre-race releases, although valid and consistent with public policy as to negligent conduct, are invalid and contrary to public policy as to wanton *200 or willful conduct." (Emphasis added.)
551 So.2d at 932-33.
Applying the BIR analysis to the facts of this case, we are clear to the conclusion that, if public policy prohibits releases as to future wanton conduct in the context of an automobile race, releases as to future intentional tortious conduct in the instant context would likewise be prohibited.
Because the trial court, in entering summary judgment with respect to the claims alleging intentional torts, based its decision solely on the existence of the document that purported to release the defendants from any and all liability, the summary judgment must be reversed insofar as it favored the defendants on those claims alleging intentional non-defamation torts.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and ALMON, SHORES, HOUSTON and KENNEDY, JJ., concur.
MADDOX and STEAGALL, JJ., concur in the result as to the defamation claim and dissent as to the other claims.
MADDOX, Justice (concurring in the result as to the defamation claim; dissenting as to the other claims).
A doctor, in order to get medical malpractice insurance, authorized MASA to contact the defendants and inquire about his reputation, for purposes of determining his insurability. When the defendants furnished information to an agent of MASA that the doctor considered to be tortious, he sued. The majority permits him to do so. Why?
If ever there was a case in which a signed release should be enforced, it is this case. The world of jobs, credit, security clearances, and even federal judgeships[2] and lawyer competence[3] depend, to some degree, upon information obtained from references. To allow a lawsuit under these circumstances, where the information obtained forms the basis for the tort action, can only have a chilling effect upon the obtaining of information in a variety of settings. Why would anyone give information concerning another, whether favorable or unfavorable, if he or she might be faced later with a lawsuit based on a claim of intentional misconduct. Because of these policy considerations, I must dissent from the reversal of the summary judgment on the intentional non-defamation torts.
The legal basis for my dissent is essentially the same as the one I set out in Barnes v. Birmingham Int'l Raceway, 551 So.2d 929 (Ala.1989), that a person should be bound by his written release.
Because I am of the opinion that the information obtained was obtained as the result of an authorization given by the plaintiff himself, I would not permit his tort suit.
STEAGALL, Justice (concurring in the result as to the defamation claim; dissenting as to the other claims).
Here, these defendants were not engaged in any business relationship with this plaintiff. They did not seek to make statements regarding him and were not volunteers in doing so. To the contrary, they were sought out by the plaintiff's agent for the purpose of securing statements regarding the plaintiff. They gave these statements upon the plaintiff's own assurance that they were free to speak without fear of having to defend a lawsuit for having spoken openly and freely. To allow this plaintiff, under these facts, to sue these defendants goes too far, in my opinion. I consider this to be an unwarranted extension of the holding in Barnes v. Birmingham Int'l Raceway, 551 So.2d 929 (Ala.1989). Therefore, I concur in the result as to the majority's ruling in the *201 defamation claim, and I dissent as to its ruling regarding the other claims.
NOTES
[1] The validity of the release is the only issue affirmatively raised by the defendants' motion, and the plaintiff concedes its validity with respect to his claims for unintentional torts.
[2] I received a telephone inquiry recently about an attorney who is being considered for a federal judgeship.
[3] The Martindale-Hubbell Directory is dependent almost entirely on information furnished in writing by references.